UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| **AURORA LOAN SERVICES, LLC.** | ) | |
| **f/k/a AURORA LOAN SERVICES, INC.** | ) | |
| **and LEHMAN BROTHERS HOLDINGS,** | ) | |
| **INC.,** | ) | |
| | ) | |
| **Plaintiffs** | ) | |
| | ) | |
| **VS.** | ) | **C.A. NO. 07-00441-ML** |
| | ) | |
| **DREAM HOUSE MORTGAGE** | ) | |
| **CORPORATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT'S OBJECTION
## TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

NOW COMES the Defendant, Dream House Mortgage Corporation ("Dream House"), and, pursuant to Fed. R. Civ. P. 7 and 56 and LR Cv. 7 and 56, hereby objects to the Plaintiffs' Motion for Partial Summary Judgment. In support of this Objection, Dream House relies on the (1) Statement of Disputed Facts, (2) Memorandum of Law In Opposition to Plaintiffs' Motion For Partial Summary Judgment and the supporting declarations and Exhibits, all of which are filed and served contemporaneously with this Objection.

Dream House requests oral argument on this Objection and anticipates it would require 15-45 minutes.

Dream House Mortgage Corporation,

By Its Attorneys,


/s/ Peter J. Brockmann
Peter J. Brockmann, Esq. #4355
Brockmann & Associates, Ltd.

77 Narragansett Avenue
Jamestown, Rhode Island 02835
(401) 423-1969; (401) 633-6143 FAX
pjb@brocklaw.net


/s/ Lynn C. Abbott
/s/ Mark A. Davis
Lynn C. Abbott, Esq. (#4230)
Mark A. Davis, Esq. (#5016)
Martineau Davis & Associates PC
2639 South County Trail
East Greenwich, Rhode Island 02818
(401) 398-8333; (401) 398-8334 FAX
labbott@mdalegal.com
mdavis@mdalegal.com

Dated: November16, 2009


## CERTIFICATE OF SERVICE

To:   Thomas J. Enright, Esq.            Matthew D. Spohn, Esq.
      Attorney Kathryn D. Ryan          Reilly Pozner, LLP.
      PARTRIDGE, SNOW & HAHN            511 16TH Street, Suite 700
      180 South Main Street             Denver, CO 80202
      Providence, Rhode Island 02903

      The undersigned hereby certifies that on November 16, 2009, I electronically filed this Defendant's Objection to Plaintiffs' Motion For Partial Summary Judgment along with the supportive Memorandum, Declarations, and Exhibits. This document is available for viewing and downloading from the Court's electronic case filing system. Service on the above-identified counsel of record will be effectuated by electronic means and by mailing first class mail, postage prepaid to non-registered parties.

                        /s/ Lynn C. Abbott

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| AURORA LOAN SERVICES, LLC, f/k/a )<br>AURORA LOAN SERVICES, INC., and )<br>LEHMAN BROTHERS HOLDINGS, INC. )<br>Plaintiffs )<br>)<br>v. )<br>)<br>DREAM HOUSE MORTGAGE )<br>CORPORATION, )<br>Defendant. ) | C.A. No.: 07-441-ML |

### DEFENDANT'S STATEMENT OF DISPUTED FACTS IN RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Now comes Defendant, Dream House Mortgage Corporation ("Dream House"), and hereby submits, pursuant to LR Cv 56(a)(3), its Statement of Disputed Facts in Response to Plaintiffs' Motion for Partial Summary Judgment ("the Motion"). Specifically, Dream House disputes the Plaintiffs' facts as follows:

Re: Plaintiffs' #1

Defendant disputes that it is currently originating mortgage loans and then selling some of those loans to investors such as Lehman Brothers Bank, FSB ("LBB"). See Ponte Declaration, ¶15.

Re: Plaintiffs' #3

Plaintiffs' pleadings (Paragraph 10 of the Complaint, First Amended Complaint and Paragraph 11 of the Second Amended Complaint) states that the contract breached by Dream House is the October 14, 2004, Loan Purchase Agreement. However, the Plaintiffs have filed the Motion based upon an entirely different contract, one dated December 19, 2002. Further, discovery produced by the Plaintiffs indicates the existence

1

of yet a third possible contract from 2003, though the Plaintiffs have failed to mention it in their pleadings or in the Motion.  (See Declar. of Brockmann ¶ 5 & Exhibit D)

Re: Plaintiffs' #6

Plaintiffs' pleadings (Paragraph 10 of the Complaint, First Amended Complaint and Paragraph 11 of the Second Amended Complaint) states that the contract breached by Dream House is the October 14, 2004, Loan Purchase Agreement.  However, the Plaintiffs have filed the Motion based upon an entirely different contract, one dated December 19, 2002.  Further, discovery produced by the Plaintiffs indicates the existence of yet a third possible contract from 2003, though the Plaintiffs have failed to mention it in their pleadings or in the Motion. *Exhibit D.*  Thus, Dream House disputes whether any of the loans at issue here were sold pursuant to the agreement referenced by the Plaintiffs.

Re: Plaintiffs' #7

Dream House disputes these facts insofar as they refer to mortgage loans that are not the subject matter of this action.  With respect to the loans that are the subject matter of this action, Dream House disputes said fact(s) based on the following evidence:

a.      The only Master Servicing Agreement produced by the Plaintiffs is between Lehman Capital and Aurora Loan Services, Inc.  (ALS 1682-1738)

b.      **Loan Number ****4059**

Prior to the commencement of this action, LBB sold this loan to an entity called SASCO 2006-S3. *Exhibit* F.

c.      **Loan Number ****8712**

Promptly after its purchase of this loan from Dream House, LBB sold it to an entity called SASCO 2006-S4. *Exhibit G.*

    d.    **Loan Number ****8647**

Promptly after its purchase of this loan from Dream House, LBB sold it to an entity called LXS 2006-17. *Exhibit* H. Furthermore, as of May 15, 2007, discovery produced by the Plaintiffs discloses yet another owner of this loan (SASCO 2005-S2). (ALS644)

    e.    **Loan Number ****6785**

Prior to the commencement of this suit, LBHI sold this loan to an entity called REO LLC 2008-2. *Exhibit I.*

    f.    **Loan Number ****9084**

Promptly after its purchase of this loan from Dream House, LBB sold it to an entity called SASCO 2007-S1. *Exhibit J.*

    g.    **Loan Number ****1523**

Promptly after its purchase of this loan from Dream House, LBB sold it to an entity called SARM 2007-4. *Exhibit* K. Ownership of this loan by SARM 2007-4 is further evidenced in ALS 885.

    h.    **Loan Number ****8933**

Soon after its purchase of this loan from Dream House, LBB sold it to an entity called REO, LLC 2008-2. *Exhibit* L. In addition, documents produced by the Plaintiffs evidence transfer of ownership of this loan from LBHI to Structured Asset Security Corp. and then to an entity called RLT 2008-AH2. (ALS2038-2039)

    i.    **Loan Number ****8551 (9180)**

Promptly after its purchase of this loan from Dream House, LBB sold it to an entity called RLT 2008-2. *Exhibit* M.

      j.    **Loan Number \*\*\*\*4961**

Promptly after its purchase of this loan from Dream House, LBB sold it to an entity called RLT 2008-2. *Exhibit N.*

Re: Plaintiffs' #8

Dream House disputes these facts insofar as they refer to mortgage loans that are not the subject matter of this action. With respect to the loans that are the subject matter of this action, Dream House disputes said fact(s) based on the evidence referenced above in response to Plaintiffs' #7.

Re: Plaintiffs' #9

Dream House disputes that LBHI is the parent corporation of Aurora based upon, among other things, the Second Amended Complaint (¶ 9) which states that LBB (not LBHI) owns (is the sole member of) Aurora. Further, section 800 of the Seller's Guide defines Lehman Brothers Bank, FSB (LBB) as the "parent company of Aurora Loan Services". *Exhibit* R.

Re: Plaintiffs' #10

Insofar as the Plaintiffs again reference a loan purchase agreement dated December 19, 2002, there is a dispute (indeed, uncertainty and confusion on Plaintiffs' part) regarding what loan purchase agreement(s), if any, were assigned by LBB to LBHI. Further, Plaintiffs produced a single "Assignment Agreement" between LBB and LBHI dated as of September 2, 2008. *Exhibit* E. Before that date, LBB had sold its interest in many of the subject loans (see Dream House response to Plaintiffs' #7 above and exhibits

4

thereto) and thus said Assignment Agreement would not have applied to those Dream House loans except to the extent they were re-transferred back to LBB.

**Loan#****9084**

Re: Plaintiffs' #21

Dream House disputes that the first payment was due to Aurora on March 1, 2007; rather the first payment on this loan was due Aurora on April 1, 2007. *Exhibit* Q.

**Loan#****1087**

Re: Plaintiffs' #26

Dream House disputes that this loan was eligible for delegated underwriting authority because the loan amount was less than $1 million. Though this loan was in fact under $1 million, there are two other criterion that, if either is triggered, the loan is not eligible for delegated underwriting, Ponte Decl. ¶12. Therefore, in order for any of the subject loans, including this loan, to be eligible for underwriting authority, all three criterion must be satisfied. Plaintiffs have failed to produce any evidence establishing that all criterion were satisfied in connection with this loan.

**Loan#****8875**

Re: Plaintiffs' #51

Dream House disputes that the first payment was due to Aurora on March 1, 2007; rather the first payment was due to Aurora on April 1, 2007. *Exhibit* S.

Re: Plaintiffs' #52

Dream House disputes that the first payment *due Aurora* was attempted on March 28, 2007; rather, the first payment *due Aurora* was made on April 16, 2007. *Exhibit* T.

**Loan#****9180**

5

Re: Plaintiffs' #59

Dream House disputes that this loan was eligible for delegated underwriting authority because it fell within the scope of Dream House's underwriting authority. Though this loan was in fact under $1 million, there are two other criterion that, if either is triggered, the loan is not eligible for delegated underwriting. Ponte Decl. ¶ 12. Therefore, in order for any of the subject loans, including this loan, to be eligible for underwriting authority, all three criterion must be satisfied. Plaintiffs have failed to produce any evidence establishing that all criterion were satisfied in connection with this loan. To the contrary, this loan was a Lehman loan product called "mortgage maker", was not eligible for delegated underwriting authority and was underwritten by Aurora. See Ponte Declaration, ¶¶ 13, 14.

**Loan#****8712**

Re: Plaintiffs' #72

Dream House disputes that borrower did not disclose two mortgages outstanding on an undisclosed property he owned. The property was disclosed on the loan application but a typo was made to one digit in the address. (DH1662) Before Aurora purchased the loan the mortgages were discovered and Dream House (K. Ferranti) faxed the revised loan application to Aurora (C. Tomazin). Aurora (Barbara Ashford) sent a subsequent Purchase Suspense letter clearing the condition of revising an updated 1003 to include the two mortgages. *Exhibit* P.

Re: Plaintiffs' #73

Dream House disputes that the information was omitted. See Plaintiff #72 above.

Re: Plaintiffs' #74

Dream House disputes the borrower misrepresented  his mortgage debts in accordance with #72 above.

**Loan#****8647**

Re: Plaintiffs' #77

Dream House disputes that the borrower did not disclose two mortgages outstanding on an undisclosed property he owned.  The property was disclosed on the loan application but a typo was made to one digit in the address.  (DH1662)  Before Aurora purchased the loan the mortgages were discovered and Dream House (K. Ferranti) faxed the revised loan application to Aurora (C. Tomazin).  Aurora (B. Ashford) sent a subsequent Purchase Suspense letter clearing the condition of revising an updated 1003 to include the two mortgages. *Exhibit* P.

Re: Plaintiffs' #78

Dream House disputes that the information was omitted.  See Plaintiff #77 above.

Re: Plaintiffs' #79

Dream House disputes the borrower misrepresented  his mortgage debts in accordance with #77 above.

Dated: November 16, 2009

DREAM HOUSE MORTGAGE
CORPORATION,

By its attorneys:

/s/ Peter J. Brockmann
Peter J. Brockmann, Esq. #4355
Brockmann & Associates, Ltd.
77 Narragansett Avenue
Jamestown, Rhode Island 02835
(401) 423-1969; (401) 633-6143 FAX
pjb@brocklaw.net

and

/s/ Lynn C. Abbott
/s/ Mark A. Davis
Lynn C. Abbott, Esq. (#4230)
Mark A. Davis, Esq. (#5016)
Martineau Davis & Associates PC
2639 South County Trail
East Greenwich, Rhode Island 02818
(401) 398-8333; (401) 398-8334 FAX
labbott@mdalegal.com
mdavis@mdalegal.com

## CERTIFICATE OF SERVICE

To:    Thomas J. Enright, Esq.               Matthew D. Spohn, Esq.
       Attorney Kathryn D. Ryan             Reilly Pozner, LLP.
       PARTRIDGE, SNOW & HAHN               511 16TH Street, Suite 700
       180 South Main Street                Denver, CO 80202
       Providence, Rhode Island 02903

The undersigned hereby certifies that I electronically filed this Defendant's Statement of Disputed Facts In Response To Plaintiffs Motion For Partial Summary Judgment on November 16, 2009.  This document is available for viewing and downloading from the Court's electronic case filing system.  Service on the above-identified counsel of record will be effectuated by electronic means and by mailing first class mail, postage prepaid to non-registered parties.

/s/ Lynn C. Abbott

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| AURORA LOAN SERVICES, LLC, f/k/a ) <br> AURORA LOAN SERVICES, INC., and ) <br> LEHMAN BROTHERS HOLDINGS, INC., ) <br> Plaintiffs ) <br> ) <br> v. ) <br> ) <br> DREAM HOUSE MORTGAGE ) <br> CORPORATION, ) <br> Defendant. ) | C.A. No.: 07-441-ML |

### DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS OBJECTION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

### Introduction

Though the Plaintiffs would have this Court believe that their complicated

relationship with Dream House Mortgage Corporation ("Dream House") involving tens

of millions of dollars worth of mortgage loans, originated and sold over the course of

many months can be simply disposed of summarily, there are critical and multiple

material facts that are genuinely at issue. Indeed, simply comparing and contrasting the

Plaintiffs' pleadings with their summary judgment papers reveal that the fact most

fundamental to the Plaintiffs' claims (the existence of a contract) is at issue. Thus, as

with the four additional loans that are the subject of this action but with respect to which

Plaintiffs have not moved for summary judgment, adjudication of Dream House's

liability – if any – regarding the remaining 17 loans necessitates the assistance of a fact

finder.

1

**Factual Background**

In 1988, John Ponte incorporated Dream House in Rhode Island to be a mortgage lender/broker. See Declaration of John Ponte ("Ponte Decl."), ¶ 2. Since then, Dream House has originated thousands of mortgage loans to borrowers in just about every state of this country. See id, ¶ 3. In or before 2002, Dream House started selling some of these loans to the Plaintiffs; for example, in 2006, Dream House sold approximately 52 loans to the Plaintiffs while, in 2007, Dream House sold approximately 260 loans to the Plaintiffs. See id, ¶ 5. Essentially, Dream House was a so-called correspondent lender, or conduit, for the Plaintiffs (and other investors as well). See id, ¶ 6.

As was the case with many of the loans referenced in this action, Dream House would identify borrowers and their mortgage loan needs and provide that information to the Plaintiffs who would, in turn, underwrite and approve the loans. See id, ¶ 7. On behalf of the Plaintiffs, Dream House would then fund and close the loans obtaining and providing whatever information and documentation the Plaintiffs required. See id, ¶ 8. Promptly thereafter, the Plaintiffs would then buy the loans. See id, ¶ 8.

So as to evidence the sale of the mortgage loans from Dream House to the Plaintiffs, the parties from time to time entered into so-called loan purchase agreements ("LPA's"). See id, ¶ 9. Because Dream House did not sell loans to the Plaintiffs in bulk (groups), individual LPA's were prepared by the Plaintiffs for execution and return by Dream House. (See Declar. of Brockmann ¶ 2 & Exhibit A); Ponte Decl., ¶¶ 9,10. Accordingly, multiple LPA's were signed by the parties over the course of their relationship from on or before 2002 until 2007. See Ponte Decl., ¶¶ 9, 10.

Eventually, by correspondence dated September 23, 2005, and July 11, 2006, plaintiff Aurora Loan Services ("ALS") granted to Dream House delegated underwriting authority. See id, ¶ 11. Pursuant to the authorization letters, the following types of products/programs were excluded from delegated underwriting authority, meaning the following types of programs/products were note eligible for delegated underwriting and thus had to be underwritten by ALS:

a.    Any loan not conforming to ALS guidelines unless a Loan Parameter
      Exception Request was approved by ALS.
b.    Transaction amounts greater than $1 million.
c.    Credit Solutions / Expanded Options.

See id, ¶ 12. As a result, the following loans referenced in this action were not eligible for delegated underwriting by Dream House: 1) number ****8933; 2) number ****1572; 3) number ****1523; 4) number ****6785; 5) number ****7031; 6) number ****1838; 7) number ****2008; 8) ****8875; 9) number ****4059; 10) number ****9180; 11) number ****1191; 12) number ****4961; 13) number ****8712; and 14) number ****8647. See id, ¶ 13. These loans were underwritten by ALS. See id, ¶ 14.

Prior to commencement of this action, Dream House ceased originating new loans. See id, ¶ 15.

The Plaintiffs commenced this action in 2007 and have since filed two amended complaints. In all three of the complaints, the Plaintiffs allege and plead the existence of a single loan purchase agreement dated October 14, 2004. (See Declar. of Brockmann ¶ 3 & Exhibit B)  It is that single contract upon which the Plaintiffs have brought this action seeking damages for breach of contract and for indemnification (Plaintiffs do not move for summary judgment as to their Count 2 (unjust enrichment)). Not once in their first three pleading attempts do the Plaintiffs mention – let alone assert the breach of –

3

any loan purchase agreement other than the 2004 contract.  By contrast, the Plaintiffs now move for summary judgment based upon an entirely different loan purchase agreement, this one dated December 19, 2002.  (See Declar. of Brockmann ¶ 4 & Exhibit C)

## Summary Judgment Standards

Summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Commercial Union Ins. Co. v. Pesante, 459 F.3d 34, 37 (1st Cir.2006) (quoting Fed.R.Civ.P. 56(c)); accord Kearney v. Town of Wareham, 316 F.3d 18, 21 (1st Cir.2002).  "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir.2000) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir.1996)).  A fact is "material" if it "possess[es] 'the capacity to sway the outcome of the litigation under the applicable law.' " Cadle Co. v. Hayes, 116 F.3d 957, 960 (1st Cir.1997) (quoting Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir.1995)).  In prospecting for genuine issues of material fact, all conflicts and all reasonable inferences must be resolved and drawn in the nonmovant's favor.  See Calvi v. Knox County, 470 F.3d 422, 426 (1st Cir.2006).

The moving party bears the burden of demonstrating that no genuine issue of material fact exists. Clifford v. Barnhart, 449 F.3d 276, 280 (1st Cir.2006). "In determining whether that burden is met, a court must view the record in the light most

favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor." Id.   "[W]hen the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage." Coyne v. Taber Partners I, 53 F.3d 454, 460 (1st Cir.1995).   Furthermore, "[s]ummary judgment is not appropriate merely because the facts offered by the moving party seem more plausible, or because the opponent is unlikely to prevail at trial. If the evidence presented is subject to conflicting interpretations, or reasonable men might differ as to its significance, summary judgment is improper." Gannon v. Narragansett Elec. Co., 777 F.Supp. 167, 169 (D.R.I.1991) (citation and internal quotation marks omitted).

## Legal Analysis

### A.  A Genuine Issue of the Most Material of Facts Exists Regarding Which Contract or Contracts the Plaintiffs Allege Was Breached.

The question of which contract is at issue and thus the subject of this lawsuit is a genuine issue of a material fact.  Plaintiffs move for partial summary judgment on a contract that has never even been mentioned in their pleadings.  Simply by comparing and contrasting the Plaintiffs' pleadings with their summary judgment papers, it becomes quickly and quite readily apparent that the Plaintiffs' case suffers from a fundamental and critical disconnect.  The pleadings allege the existence and breach of a 2004 agreement, while the summary judgment papers rely upon a 2002 agreement.  The essence of the Plaintiffs' case is a breach of contract action; however, Dream House is left to guess which contract it allegedly breached - or did it breach more than one contract?  The contract contained in the pleadings is dated later than the contract contained in the summary judgment papers; however, it would seem logical to assume that the later of the

two agreements is the operative contract. The Plaintiffs, however, seek summary judgment on the earlier of the two contracts.

Further creating an issue regarding the identity of the operative contract (or contracts) is an exhibit (#22; ALS #001) produced by the Plaintiffs at Mr. Ponte's deposition. (See Declar. of Brockmann ¶ 5 & Exhibit D) That document (an Indemnification Agreement dated as of August 16, 2007), relates to Loan number ****7031 and references a loan purchase agreement dated as of April 10, 2003. See id. However, the Plaintiffs fail to make any mention of such an agreement in their pleadings or in their summary judgment papers; nor have the Plaintiffs produced any such document in discovery in this matter. Thus, there are at least three loan purchase agreements *possibly* at issue in this case: the 2004 agreement alleged in multiple versions of the Plaintiffs' pleadings, a 2002 version implicated in the summary judgment papers and yet a third one, dated in 2003, a copy of which the Plaintiffs have failed to a) produce to Dream House, b) include in their pleadings, and c) include in their summary judgment papers. Importantly, the 2003 agreement apparently relates to loan number ****7031, one of the loans on which the Plaintiffs now seek summary judgment. Based upon the movants papers, we are being asked to disregard the 2003 and 2004 agreements and rely upon the earliest of the three agreements (2002). The earliest of the loans at issue is dated in January 2006; why wouldn't the 2003 or 2004 agreement apply? Indeed, one must wonder if a new loan purchase agreement was signed each year, in which case there should be agreements dated 2005, 2006 and 2007 (all years in which Dream House sold loans to the Plaintiffs).

Though at first glance the 2002 and 2004 loan purchase agreements would appear to be similar if not nearly identical, and thus a distinction between the two *may* seem immaterial, they are in fact different in very material ways. Determining which of the two contracts applies in this case is thus a material fact. The Plaintiffs move for partial summary judgment on fifteen (15) loans they allege went into so called early payment default (EPD), thereby triggering some obligations on the part of Dream House to repurchase those loans and/or provide indemnification. What makes the distinction between the 2002 and 2004 contracts is how EPD is defined therein. The 2002 agreement does not include a definition of EPD (and thus presumably incorporates the definitions of EPD contained in the Seller's Guide) while the later agreement not only includes an EPD definition but also contains two additional pages (so-called Annex 1) of representations, warranties, covenants and agreements of the seller. Determining what definition of EPD – if any – applies to the 15 loans at issue is critical in ascertaining whether there were triggered any additional obligations of Dream House. The 2004 agreement defines an EPD as the borrower's failure "to make any two (2) of the first six monthly payments due to the Seller … within thirty (30) days after each such payment was due." (See Declar. of Brockmann ¶ 3 & Exhibit B)  By contrast, the Seller's Guide contains three (3) different definitions for EPD, all of which differ from the definition of EPD found in the 2004 agreement.

In short, the very essence – the most fundamental fact – of the Plaintiffs' case is to prove the existence of a valid, enforceable contract. That fact is genuinely at issue here because the Plaintiffs have sued on a contract different from the one which they now ask the Court to grant them summary judgment. Further adding to the confusion

regarding this fundamental fact is the existence of yet a third agreement that applies to at least one of the loans at issue – an agreement not contained or even mentioned in the Plaintiffs' pleadings or in their motion papers.

### B. A Genuine Issue of Material Fact Exists Regarding Whether the Plaintiffs Even Have Enforceable Rights to Bring This Action on Certain of the Subject Loans.

According to the Plaintiffs, each and every one of the loans at issue in this matter was sold by Dream House to Lehman Brothers Bank, FSB ("LBB"). *Second Amended Complaint*, ¶ 13. Thereafter, according to the Plaintiffs, LBB assigned all of its rights and remedies in and to the loans to Lehman Brothers Holdings, Inc. ("LBHI"). *Id.* at ¶ 14. The agreement purportedly effectuating that assignment is dated as of September 2, 2008. (See Declar. of Brockmann ¶ 6 & Exhibit E)   Plaintiffs rely upon said document for LBHI's authority to bring this action against Dream House.

However, according to loan transfer histories dated May 8, 2009, obtained by Dream House through discovery, many of the loans upon which the Plaintiffs now move for summary judgment were sold by LBB to other parties.  For example, just a few months after the closing of loan number ****4059, LBB (also known by its investor code: B64) sold the loan to SASCO 2006-S3 (investor code: M61).  (See Declar. of Brockmann ¶ 7 & Exhibit F)   The Plaintiffs have not provided any further documentation evidencing that sale, so there is no evidence to prove what, if any, rights and remedies of LBB with respect to that loan and any related loan purchase agreement were sold, transferred or retained by LBB.  See *Declaration of Peter J. Brockmann* ("Brockmann Decl."), ¶8. The Plaintiffs' loan transfer history for this loan also reveals additional transfers of this loan until, eventually, the loan was sold to LBHI (investor

code: R64) with an effective date of May 1, 2007.  (See Declar. of Brockmann ¶ 7&

Exhibit F)   Again, there are no documents evidencing that sale (or any of the intervening

sales) and the ultimate sale to LBHI predates by more than one year the document upon

which the Plaintiffs rely to establish transfer from LBB to LBHI.  Brockmann Decl. ¶8.

Other loans that were similarly sold by LBB to other investors are as follows (in

the order in which they appear in the *Defendant's Statement of Disputed Facts* – see

attached):

Loan number ****8712 - sold by LBB to SASCO 2006-S4 (M61) effective

October 1, 2006, and, after one other transfer of ownership, sold to LBHI.  (See Declar.

of Brockmann ¶ 9 & Exhibit G)

Loan number ****8647 – sold by LBB to LXS 2006-17 (F79) on October 27,

2006, then to LBH (prior to the date of the Assignment Agreement) and from there on to

an entity called REO LLC 2008-2.  (See Declar. of Brockmann ¶ 10 & Exhibit H)

Loan number ****6785 – sold by LBB to SARM 2007-4 on February 26, 2007,

then to LBHI (5/31/07) and ultimately on to REO LLC 2008-2 (6/3/08).  (See Declar. of

Brockmann ¶ 11& Exhibit I)

Loan number ****9084 – sold by LBB to SASCO 2007 – S1 on March 26, 2007,

then back to LBB three days later then on to LBHI on May 29, 2008 (prior to the date of

the Assignment Agreement).  (See Declar. of Brockmann ¶ 12 & Exhibit J)

Loan number ****1523 – sold by LBB to SARM 2007-4 on April 25, 2007, then

on  to LBHI a few months later and ultimately to REO LLC 2008-2 on June 3, 2008.

(See Declar. of Brockmann ¶ 13& Exhibit K)

Loan number ****8933 – sold by LBB to REO LLC 2008-2 effective prior to commencement of this action, and never sold, assigned or otherwise transferred back to LBB or to LBHI.  (See Declar. of Brockmann ¶ 14 & Exhibit L)

Loan number ****8551 (9180) – sold by LBB to RLT-2008-2 on June 3, 2008, and never sold, assigned or transferred back to LBB or LBHI.  (See Declar. of Brockmann ¶ 15 & Exhibit M)

Loan number ****4961 – sold by LBB too RLT 2008-2 on June 3, 2008; according to this loan transfer history, this was the only transfer of this loan and thus neither LBHI nor LBB have any ownership interest in it (as is true of some of the other loans above).  (See Declar. of Brockmann ¶ 16 & Exhibit N)

Again, with respect to all these loan transfers from LBB, the Plaintiffs have not come forward with any evidence to establish that rights and remedies under any loan purchase agreement(s) and/or the Seller's Guide were transferred, sold or retained by LBB and/or LBHI.  Brockmann Decl., ¶8.  Nor have the Plaintiffs provided any evidence to establish that they currently have standing to sue Dream House with respect to these loans, thereby creating a factual issue for trial.  *Id.* at ¶8.

### C.  An Additional Genuine Issue of Material Fact Exists Specifically Regarding Loans Numbered ****8712 and ****8647.

Loans numbered ****8712 and ****8647 are first and second mortgage loans to a borrower to purchase certain real estate located in Myrtle Beach, South Carolina. Because the loans totaled over one (1) million dollars, Dream House did not have authority to underwrite these loans.  Ponte Decl., ¶ 12.  Aurora underwrote these loans through the "Stated Income / Stated Assets" program which qualified for "Reduced Documentation" – an Aurora credit processing option which allows little or no income,

employment or asset verification.  Ponte Decl., ¶ 13; (See Declar. of Brockmann ¶ 17 & Exhibit O)

As opposed to all the other loans on which the Plaintiffs request summary judgment, the Plaintiffs have sued on these two loans not based upon alleged early payment defaults.  Instead, the Plaintiffs have sued on these loans based upon alleged misrepresentations and/or omissions of the borrower during the loan application process. Specifically, Plaintiffs allege that the borrower failed to disclose all of his debts while applying for the loans.

Before LBB purchased these loans from Dream House, three credit reports were pulled for this borrower:

1.      Kroll Factual Data – pulled by Dream House on May 12, 2006, did not show three mortgages that were later questioned by Aurora;

2.      Credit Information Bureau – pulled by Dream House on May 23, 2006, which showed one of the three additional mortgages in question; and

3.      Kroll Factual Data – pulled by Aurora on July 14, 2007, that showed all of the additional mortgages in question.

Aurora, thereafter on July 21, 2007, sent Dream House a letter acknowledging receipt of the updated 1003 (loan application) showing the corrections regarding the properties owned by borrower and their related mortgages.  (See Declar. of Brockmann ¶ 18& Exhibit P)

Plaintiffs purchased Loan Number ****8712 and Loan Number ****8647 from Dream House on September 7, 2006, with full knowledge of the two mortgages they complain of today.  The evidence is undisputed that *as of the related purchase date* the

two mortgages Plaintiffs complain of were identified by the parties and obviously addressed to the Plaintiffs' satisfaction.  Within days LBB bought these loans from Dream House.  To the extent the Plaintiffs assert some kind of misrepresentation or omission that was material to the decision to buy these loans from Dream House, there is a genuine factual dispute.

### D.  An Additional Genuine Issue of Material Fact
### Exists Specifically Regarding Loans Numbered ****9084 and ****8875.

With respect to loans numbered ****9084 and ****8875, the Plaintiffs allege that they suffered early payment defaults.  However, there is a dispute between what the Plaintiffs now allege in support of their summary judgment request and what the documents created at the time of these loans indicates.  For example, regarding ****9084, the Plaintiffs allege that the first payment was due to Aurora on March 1, 2007 (Plaintiffs' Statement of Undisputed Facts ¶ 21).  However, by correspondence dated February 13, 2007, Dream House advised the borrower that the March 2007 payment should be made payable to it, while all payments starting in April 2007 should be made payable to Aurora.  (See Declar. of Brockmann ¶ 19 & Exhibit Q)

With respect to loan numbered **** 8875, Dream House likewise disputes when the first payment was due to Aurora and when the first payment due Aurora was actually made by the borrower.  These disputed facts go to whether the loan suffered an early payment default, the very essence of the Plaintiffs' claims on these two loans

Finally, the Plaintiffs allege that Aurora is the authorized agent, servicer and/or master servicer for LBB and LBHI and Aurora is authorized and directed by LBB and LBHI to enforce any obligations owed to LBB and LBHI by Dream House for the loans at issue in this case. (See ¶7 & 8 of Plaintiffs Statement of Undisputed Facts In Support

of Motion For Partial Summary Judgment and Trumpp Decl. ¶ 5 & 6).The Master

Servicing Agreement provided through discovery, dated February 1, 1999, is between

Lehman Capital, a Division of LBHI and Aurora Loan Services, Inc.  Dream House has

not been provided any authoritative documentation between Lehman Capital and LBHI.

### Conclusion

Numerous and very fundamental issues of fact remain in dispute with respect to

each and every loan subject to the Plaintiffs' request for summary judgment.

Accordingly, Dream House respectfully requests that the Plaintiffs' motion be denied.

By Its Attorneys,


/s/ Peter J. Brockmann
Peter J. Brockmann, Esq. #4355
Brockmann & Associates, Ltd.
77 Narragansett Avenue
Jamestown, Rhode Island 02835
(401) 423-1969; (401) 633-6143 FAX
pjb@brocklaw.net


/s/ Lynn C. Abbott
/s/ Mark A. Davis
Lynn C. Abbott, Esq. (#4230)
Mark A. Davis, Esq. (#5016)
Martineau Davis & Associates PC
2639 South County Trail
East Greenwich, Rhode Island 02818
(401) 398-8333; (401) 398-8334 FAX
labbott@mdalegal.com
mdavis@mdalegal.com

Dated: November16, 2009

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| **AURORA LOAN SERVICES, LLC.** | ) | |
| **f/k/a AURORA LOAN SERVICES, INC.** | ) | |
| **and LEHMAN BROTHERS HOLDINGS,** | ) | |
| **INC.,** | ) | |
| | ) | |
| **Plaintiffs** | ) | |
| | ) | |
| **VS.** | ) | **C.A. NO. 07-00441-ML** |
| | ) | |
| **DREAM HOUSE MORTGAGE** | ) | |
| **CORPORATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>DECLARATION OF JOHN C. PONTE</u>

I, John C. Ponte, declare:

1)      I am over 18 years of age and competent to testify if so called.  I have personal knowledge of the facts set forth below.

2)      In 1988, I incorporated Dream House Mortgage Corporation ("Dream House") in Rhode Island to be a mortgage lender/broker.

3)      Since then, Dream House has originated thousands of mortgage loans to borrowers in just about every state of this country.

4)      I am and have been at all times relevant hereto the President of Dream House. As such, I oversaw and managed the day-to-day operations of the company.

5)      In or before 2002, Dream House started selling some of these loans to the Plaintiffs; in 2006, for example, Dream House sold approximately 52 loans to the Plaintiffs while, in 2007, Dream House sold approximately 260 loans to the Plaintiffs.

6)      Essentially, Dream House was a so-called correspondent lender, or conduit, for the Plaintiffs (and other investors).

7)      As was the case with many of the loans referenced in this action, Dream House would identify borrowers and their mortgage loan needs and provide that information to the Plaintiffs who would in due course underwrite and approve the loans.

8)      On behalf of the Plaintiffs, Dream House would then close and fund the loans obtaining and providing whatever information and documentation the Plaintiffs required. Promptly thereafter, the Plaintiffs would buy the loans.

9)      So as to evidence the sale of the loans from Dream House to the Plaintiffs, the parties from time to time entered into so-called loan purchase agreements.

10)     The loans were not purchased by the Plaintiffs in bulk; rather, they were purchased on an individual basis.

11)     Eventually, by correspondence dated September 23, 2005, and July 11, 2006, plaintiff Aurora Loan Services ("ALS") granted to Dream House delegated underwriting authority.  True and accurate copies of said correspondence are attached hereto marked Exhibits A and B, respectively.

12)     Pursuant to the authorization letters, the following types of products/ programs were excluded from delegated underwriting authority, meaning the following types of programs/products were note eligible for delegated underwriting and thus had to be underwritten by ALS:

    a.      Any loan not conforming to ALS guidelines unless a Loan Parameter
            Exception Request was approved by ALS.
    b.      Transaction amounts greater than $1 million.
    c.      Credit Solutions / Expanded Options.

2

13)     As a result, the following loans referenced in this action were not eligible for delegated underwriting by Dream House: 1) number ****8933; 2) number ****1572; 3) number ****1523; 4) number ****6785; 5) number ****7031; 6) number ****1838; 7) number ****2008; 8) ****8875; 9) number ****4059; 10) number ****9180; 11) number ****1191; 12) number ****4961; 13) number ****8712; and 14) number ****8647.

14)     Said loans were underwritten by ALS.

15)     Prior to commencement of this action, Dream House ceased originating new loans.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated this 16th day of November, 2009.

_____
John C. Ponte

# AURORA LOAN SERVICES

*A Lehman Brothers Company*

10350 Park Meadows Drive, Littleton, CO 80124
Phone: 720-945-3000  Fax: 720-945-5928

July 11, 2006

Kenneth Ferranti
Vice President
Dream House Mortgage Corporation
385 South Main Street
Providence, RI 02903

Re:   Authorization Granted for Delegated Underwriting Authority

Dear Kenneth Ferranti:

Please accept this correspondence as authorization for Dream House Mortgage Corporation ("Seller") to utilize Delegated Underwriting Authority, as outlined in Aurora Loan Services Inc. ("Aurora") Seller's Guide Section 717. The granting of this authorization supercedes any language found to the contrary in the Loan Purchase Agreement executed between the parties.

Pursuant to Section 717, Seller will be expected to comply with all Representations and Warranties outlined in the Seller's Guide, which may be amended from time to time at Aurora's discretion.

The authorization granted herein is to be strictly construed and is in no way considered a guaranty as to the purchase of loans by Aurora Loan Services Inc or Lehman Brothers Bank, FSB. This authorization may be retracted at any time at our discretion.

This authorization does not extend to the types of products/programs excluded under the Seller's Guide or the following:

1. Any loan not conforming to our guidelines, including but not limited to loan amounts, loan-to-value ratios, and credit scores, unless a Loan Parameter Exception Request has been approved.
2. Transaction amounts greater than $1 Million.
3. Expanded Options

Delegated underwriting authority extends to second lien transactions. (including HELOCS) wherever such authority has been granted for the concurrently funding first lien. In such cases, the delegated authority limit applies to the combined loan amounts, not each loan individually.


EQUAL HOUSING
LENDER

Exhibit A

# AURORA LOAN SERVICES

*A Lehman Brothers Company*

Aurora continues to offer Delegated Underwriting training sessions for new or existing delegated clients. Please contact your Account Executive for details if you wish to attend.

Please note the following if your firm uses mortgage insurance company contract underwriting services: Aurora will no longer allow a correspondent with Delegated Underwriting Authority to use Aurora's contractual arrangement with our MI partners. Accordingly, any correspondent with Delegated Underwriting Authority must negotiate an underwriting contract with its preferred MI partners. Accordingly, we will consider a loan to be underwritten pursuant to your firm's Delegated Underwriting Authority, regardless of the use of the MI company or of any guideline/contractual references contained on the MI company's decision.

Please acknowledge your receipt of this letter by signing below and returning one copy of this letter. We look forward to working with you on a delegated basis. Your staff is encouraged to call or fax information to request guidance about a specific concern.

If you have any questions about this authorization, please feel free to contact me directly at 720.945.3042

Yours truly,

Ken Brown
Vice President
Credit Policy

Acknowledged and Received By:

Name: KENNETH PERRROT

Title: VICE PRESIDENT



# AURORA LOAN SERVICES

*A Lehman Brothers Company*

10350 Park Meadows Drive, Littleton, CO 80124
Phone: 720-945-3000  Fax: 720-945-5928

September 23, 2005

Kenneth Ferranti
Vice President
Dream House Mortgage Corp.
385 S. Main St.
Providence, RI 02903

Re:    Authorization Granted for Delegated Underwriting Authority

Dear Kenneth Ferranti:

Please accept this correspondence as authorization for Dream House Mortgage Corp. ("Seller") to utilize Delegated Underwriting Authority, as outlined in Aurora Loan Services Inc. ("Aurora") Seller's Guide Section 717. The granting of this authorization supercedes any language found to the contrary in the Loan Purchase Agreement executed between the parties.

Pursuant to Section 717, Seller will be expected to comply with all Representations and Warranties outlined in the Seller's Guide, which may be amended from time to time at Aurora's discretion.

The authorization granted herein is to be strictly construed and is in no way considered a guaranty as to the purchase of loans by Aurora Loan Services Inc or Lehman Brothers Bank, FSB. This authorization may be retracted at any time at our discretion.

This authorization does not extend to the types of products/programs excluded under the Seller's Guide or the following:

1. Any loan not conforming to our guidelines, including but not limited to loan amounts, loan-to-value ratios, and credit scores, unless a Loan Parameter Exception Request has been approved.
2. Transaction amounts greater than $1 million.
3. Credit Solutions

Delegated underwriting authority extends to second lien transactions (including HELOCS) wherever such authority has been granted for the concurrently funding first lien. In such cases, the delegated authority limit applies to the combined loan amounts, not each loan individually.



# CONFIDENTIAL

ALS0002957

*Exhibit B*

# AURORA LOAN SERVICES

*A Lehman Brothers Company*

This authorization is subject to representatives of your firm attending our Delegated Underwriting training session. Please contact your Account Executive for details.

1. This authorization is also subject to resolution of outstanding fees (Pair Off fees), due to Aurora of approximately $6712. Again, please contact your Account Executive for details.

Please note the following if your firm utilizes Aurora approved mortgage insurance company contract underwriting services: We will consider a loan to be underwritten pursuant to your firm's Delegated Underwriting Authority, unless each file contains proper notification and documentation as having been underwritten by the MI company to our guidelines.

Please acknowledge your receipt of this letter by signing below and returning one copy of this letter. We look forward to working with you on a delegated basis. Your staff is encouraged to call or fax information to request guidance about a specific concern.

If you have any questions about this authorization, please feel free to contact me directly at 720.945.3042

Yours truly,

Ken Brown
Vice President
Credit Policy

Acknowledged and Received By:

Name: KENNETH FEARONT.
Title: VICE PRESIDENT

CONFIDENTIAL

ALS0002958

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

**AURORA LOAN SERVICES, LLC.** )
**f/k/a AURORA LOAN SERVICES, INC.** )
**and LEHMAN BROTHERS HOLDINGS,** )
**INC.,** )
  )
  **Plaintiffs** )
  )
**VS.** )  **C.A. NO. 07-00441-ML**
  )
**DREAM HOUSE MORTGAGE** )
**CORPORATION,** )
  )
  **Defendant.** )

## DECLARATION OF PETER BROCKMANN

I, Peter J. Brockmann, declare:

1.  I am the principal attorney at the law firm of Brockmann & Associates, Ltd. engaged in the representation of Defendant in this matter and have personal knowledge of the facts set forth below.

2.  Attached hereto as <u>Exhibit A</u> are true and accurate excerpts from the Rule 30(b)(6) deposition of Zachary Trumpp.

3.  Attached hereto as <u>Exhibit B</u> is a true and accurate copy of the loan purchase agreement dated October 14, 2004 produced by Plaintiffs.

4.  Attached hereto as <u>Exhibit C</u> is a true and accurate copy of the loan purchase agreement dated December 14, 2002 attached to Plaintiffs Motion For Partial Summary Judgment.

5.  Attached hereto as <u>Exhibit D</u> is a true and accurate copy of the Indemnification Agreement dated August 16, 2007 referencing a loan purchase agreement dated April 10, 2003 produced by Plaintiffs at the deposition of John Ponte.

6.  Attached hereto as <u>Exhibit E</u> is a true and accurate copy of the Assignment Agreement between LBB and LBHI dated September 2, 2008.

1

7.     Attached hereto as Exhibit F is a true and accurate copy of the Loan Transfer History for Loan No****4059.

8.     Plaintiffs have not provided any further documentation evidencing the sale of Loan No****4059, so there is no evidence to prove what, if any, rights and remedies of LBB with respect to that loan and any related loan purchase agreement were sold, transferred or retained by LBB.

9.     Attached hereto as Exhibit G is a true and accurate copy of the Loan Transfer History for Loan No****8712.

10.    Attached hereto as Exhibit H is a true and accurate copy of the Loan Transfer History for Loan No****8647.

11.    Attached hereto as Exhibit I is a true and accurate copy of the Loan Transfer History for Loan No****6785.

12.    Attached hereto as Exhibit J is a true and accurate copy of the Loan Transfer History for Loan No****9084.

13.    Attached hereto as Exhibit K is a true and accurate copy of the Loan Transfer History for Loan No****1523.

14.    Attached hereto as Exhibit L is a true and accurate copy of the Loan Transfer History for Loan No****8933.

15.    Attached hereto as Exhibit M is a true and accurate copy of the Loan Transfer History for Loan No****8551.

16.    Attached as Exhibit O is a true and accurate copy of a document produced by the Plaintiffs through discovery.

17.    Attached as Exhibit P is a true and accurate copy of a document produced by the Plaintiffs through discovery.

18.    Attached as Exhibit Q is a true and accurate copy of a document produced by the Plaintiffs through discovery.

I declare under penalty of perjury under the laws of the United states that the foregoing is true and correct.

Dated this 16th day of November, 2009 in East Greenwich, Rhode Island.

/s/ Peter J. Brockmann
Peter J. Brockmann

2

# EXHIBIT A

16

1     A.   Yes, it is.

2     Q.   Okay.  So it's pretty -- you're pretty

3  comfortable in saying that the entity that

4  purchased these 21 loans, that's the sub --

5  that are the subject of this lawsuit, was

6  Lehman Brothers Bank?

7     A.   Yes.

8     Q.   Okay.  So in answer to my question,

9  it's fair to say that none of the 21 loans were

10  purchased pursuant to the agreement between

11  Aurora and Dream House, which is Exhibit C,

12  correct?

13     A.   Yes.

14     Q.   Okay.  Now, can you show me which loan

15  purchase agreement is the agreement under which

16  these 21 loans were purchased?

17     A.   Would have been this one here

18  (indicating), it's Bates stamped ALS 0001797.

19     Q.   Okay.  And that, of course, is the loan

20  purchase agreement between Dream House and

21  Lehman Brothers Bank, correct?

22     A.   Correct.

23     Q.   Now, it appears that there are two

24  separate documents; the first is three pages



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.465.7236
Facsimile: 401.456.0991

Suite 402
10 Weybossett Street
Providence, RI 02903
www.esquiresolutions.com

1 and the second is five pages; is that right?

2    A.   (Deponent viewing document).   Yes.

3    Q.   Okay.   And the three-page document is

4 the loan purchase agreement?

5    A.   (Deponent viewing document).   Yes.

6    Q.   Okay.   Now, the five-page document, it

7 says, "Lehman Brothers Bank Form of Loan

8 Purchase Agreement, Bulk Purchase/Servicing

9 Released Transactions"; is that right?

10    A.   (Deponent viewing document).   Yes.

11    Q.   Okay.   And what, if you know, sir, is

12 the significance of that document?

13    A.   So correspondence had a couple of

14 different agreements for -- based upon the type

15 of the transaction.   So this second agreement

16 is for bulk purchase servicing release

17 transactions, which basically means they're

18 selling more than one loan at a time.

19    Q.   Okay.

20    A.   So it would be sold in pools of loans

21 versus an individual.

22    Q.   Okay.   Do you know if any of the 21

23 loans that are the subject of this lawsuit were

24 sold in the form of a bulk purchase or



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.465.7236
Facsimile: 401.456.0991

Suite 402
10 Weybossett Street
Providence, RI 02903
www.esquiresolutions.com

18

1  servicing release transaction?

2      A.  My understanding is, based on the fact

3  that these 21 loans had an individual purchase

4  advice, as referenced earlier by themselves,

5  they were done on a -- sold on an individual

6  basis, so they would be under the servicing

7  released agreement, not the bulk purchase

8  agreement.

9      Q.  Okay.  And that would be true for all

10 21 loans?

11     A.  Yes.

12     Q.  Okay.  It's fair to say that Lehman

13 Brothers Holdings, Inc., is in bankruptcy?

14     A.  Yes, it is.

15     Q.  Okay.  What about Lehman Brothers Bank?

16     A.  Lehman Brothers Bank is not in

17 bankruptcy.

18     Q.  Okay.  So when we talk about the

19 purchase agreement, we're talking about that

20 three-page document which is entitled,

21 "Servicing Release Transactions," correct?

22     A.  Yes.

23     Q.  Okay.  Now, in Exhibit A, which we're

24 going to keep coming back to, in the



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.465.7236
Facsimile: 401.456.0991

Suite 402
10 Weybossett Street
Providence, RI 02903
www.esquiresolutions.com

# EXHIBIT B

# LEHMAN BROTHERS BANK FSB

### FORM OF
### LOAN PURCHASE AGREEMENT

### (BULK PURCHASE/SERVICING RELEASED TRANSACTIONS)

This is a LOAN PURCHASE AGREEMENT (the "Agreement"), dated as of _October, 14 2004_ [Seller No. _8102_ ], by and between Lehman Brothers Bank, FSB ("Lehman Bank") and _Dream House Mortgage Corporation_ , having an office at _385 South Main Street Providence RI 02903_ (the "Seller").

### WITNESSETH:

WHEREAS, the Seller desires to sell to Lehman Bank, and Lehman Bank desires to purchase, from the Seller from time to time, certain adjustable and/or fixed rate residential mortgage loans (the "Mortgage Loans") which shall be delivered on a servicing released basis on the date (each, a "Purchase Date") set forth in a Purchase Price and Terms Letter to be entered into between Lehman Bank and the Seller with respect to each sale of Mortgage Loans hereunder (each, a "PP&TL");

WHEREAS, each sale of Mortgage Loans to Lehman Bank shall be made upon the terms, conditions, representations and warranties set forth in this Agreement, the related PP&TL and that certain Aurora Loan Services, Inc. Seller Guide, as amended from time to time (the "Seller Guide"), except as otherwise set forth herein;

WHEREAS, each Mortgage Loan is secured by a mortgage, deed of trust or other security instrument creating a valid lien on a residential dwelling located in the jurisdiction indicated in the Delivery Commitment Confirmation for the related Mortgage Loan;

WHEREAS, Lehman Bank and the Seller have agreed that the Mortgage Loans shall be conveyed in the manner set forth in the Seller Guide, as modified by this Agreement; and

WHEREAS, this Agreement shall be deemed to be a "Loan Purchase Agreement" referred to in Section 100 of the Seller Guide;

NOW, THEREFORE, in consideration of the premises and mutual agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lehman Bank and the Seller agree as follows:

SECTION 1.  Agreement to Purchase.  The Seller agrees to sell, and Lehman Bank agrees to purchase, from time to time, those Mortgage Loans described in a PP&TL and the related Purchase Advice, together with the servicing rights related thereto, pursuant to the terms and conditions of the Seller Guide and this Agreement.

SECTION 2.  Incorporation of Seller Guide; Conflicts; Seller Agreement.  Except as otherwise set forth herein (including any Annex or Addenda hereto), or in any related PP&TL, the terms and provisions of the Seller Guide and all forms therein are hereby incorporated and made a part hereof and are an integral part of

[Rev. 08/2002]

06/20/2003 KY

# LEHMAN BROTHERS BANK FSB

this Agreement. In the event of any conflict, inconsistency or discrepancy between any of the provisions of the Seller Guide and any of the express provisions of this Agreement, the express provisions of this Agreement shall control and be binding upon Lehman Bank and the Seller. The Seller hereby (i) acknowledges that it has received and reviewed the Seller Guide and (ii) agrees to be bound by the terms and conditions set forth therein and herein.

This Agreement includes and incorporates each of the following:

Annex 1          Additional Representations, Warranties,
                 Covenants and Agreements of the Seller

SECTION 3. Counterparts  This Agreement may be executed simultaneously in any number of counterparts. Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument.

SECTION 4. Successors and Assigns; Assignment of Loan Purchase Agreement.  This Agreement shall bind and inure to the benefit of and be enforceable by the Seller and Lehman Bank and their respective successors and assigns. This Agreement shall not be assigned, pledged or hypothecated by the Seller to a third party without the consent of Lehman Bank.

SECTION 5. Defined Terms.  Capitalized terms used but not defined herein shall have the respective meanings set forth in Section 8 of the Seller Guide.

SECTION 6. Costs.  All costs and expenses incurred in connection with the transfer and delivery of the Mortgage Loans, shall be paid by the party identified in the Seller Guide, as applicable, or if no party is identified, by the Seller.

SECTION 7. Notices.  All demands, notices and communications hereunder shall be in writing and shall be deemed to have been duly given if mailed, by registered or certified mail, return receipt requested, or, if by other means, when received by the other party at (i) the address in the Seller Guide if to Lehman Bank, and (ii) as follows if to the Seller:

Dream House Mortgage Corporation
385 South Main Street
Providence RI 02903
Attn: Kenneth Ferranti

or such other address as may hereafter be furnished to the other party by like notice. Any such demand, notice or communication hereunder shall be deemed to have been received on the date delivered to or received at the premises of the addressee (as evidenced, in the case of registered or certified mail, by the date noted on the return receipt).

SECTION 8. Governing Law.  This Agreement and the Seller Guide shall be construed in accordance with the laws of the State of New York and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with the laws of the State of New York, except to the extent preempted by Federal law.

-2-

# LEHMAN BROTHERS BANK FSB

SECTION 9. Waivers. No term or provision of this Agreement may be waived or modified unless such waiver or modification is in writing and signed by the party against whom such waiver or modification is sought to be enforced.

SECTION 10. Reproduction of Documents. This Agreement and all documents relating hereto, including, without limitation, (a) consents, waivers and modifications which may hereafter be executed, (b) documents received by any party at the closing, and (c) financial statements, certificates and other information previously or hereafter furnished, may be reproduced by any photographic, photostatic, microfilm, micro-card, miniature photographic or other similar process.   The parties agree that any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding, whether or not the original is in existence and whether or not such reproduction was made by a party in the regular course of business, and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

SECTION 11. Further Agreements. The Seller and Lehman Bank each agree to execute and deliver to the other such reasonable and appropriate additional documents, instruments or agreements as may be necessary or appropriate to effectuate the purposes of the Seller Guide.

SECTION 12. Confidentiality. The Seller hereby agrees that the terms and conditions of any Purchase Advice, this Agreement, the Seller Guide and all Delivery Commitments shall be kept confidential and their contents shall not be divulged to any party without Lehman Bank's consent except to the extent that it is necessary for the Seller to do so in working with legal counsel, auditors, taxing authorities or other governmental agencies.

SECTION 13   State of Incorporation. The Seller is duly organized validly existing and in good standing under the laws of the state of _Rhode Island_____.

IN WITNESS WHEREOF, the Seller and Lehman Bank have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the date first above written.

LEHMAN BROTHERS BANK, FSB
(Purchaser)

By: _____

Name: _Denise Elwell_____

Title: _V. P._____

(Seller)

By: _____

Name: _John C. Ponte_____

Title: _President_____

-3-

## ADDITIONAL REPRESENTATIONS, WARRANTIES, COVENANTS AND AGREEMENTS OF THE SELLER

A.   ADDITIONAL REPRESENTATIONS AND WARRANTIES

In addition to the representations and warranties contained in Section 703 of the Seller Guide, or elsewhere in the Seller Guide or this Purchase Agreement, as to each Mortgage Loan, Seller represents and warrants to Lehman Bank as of the related Purchase Date, and covenants to Lehman Bank that:

1.   Information Complete.  All data, information and other written or electronic material provided to the Purchaser or its designees with respect to the Mortgage Loan (including, without limitation, any data and information submitted for loan pricing purposes) was true, correct and complete and did not omit to state a fact necessary to make such data or information not misleading.

2.   Conformance with Underwriting Guidelines.  The Mortgage Loan was underwritten in accordance with the Underwriting Guidelines set forth in the Seller's Guide in effect at the time the Mortgage Loan was originated.  Seller has, with respect to the Mortgage Loans, complied with all requirements applicable to sellers that have received Delegated Underwriting Authority.

3.   Seller's Origination.  The Seller's decision to originate any mortgage loan or to deny any mortgage loan application is an independent decision and is in no way made as a result of Purchaser's decision to purchase, or not to purchase, or the price Purchaser may offer to pay for, any such mortgage loan, if originated.

4.   Delivery of Mortgage Documents.  The Mortgage Note and all other Mortgage Loan documents required to be delivered by the Seller under the Seller Guide have been delivered to Lehman Bank or its designee.

5.   Selection Process.  The Mortgage Loans were not intentionally selected in a manner so as to affect adversely the interests of Lehman Bank.

6.   Loan Characteristics.  With respect to the Mortgage Loans to be sold to Lehman Bank on the Purchase Date, the Mortgage Loan characteristics set forth in the PP&TL are true and complete in the aggregate.

7.   Predatory Lending Regulations, High Cost Loans  Each Mortgage Loan at the time it was made complied in all material respects with applicable local, state and federal laws including, but not limited to, all applicable predatory and abusive lending laws.  None of the Mortgage Loans are classified as "high cost", "threshold," or "predatory" loans as defined by applicable predatory and abusive lending laws (including, without limitation, under the Home Ownership and Equity Protection Act of 1994 or under any other applicable state, federal or local law ).

8.   Single Premium Credit Life Insurance.  None of the proceeds of the Mortgage Loan were used to finance single-premium credit life insurance policies.

4

9.   No Commissions to Third Parties. The Seller has not dealt with any broker or agent or anyone else who might be entitled to a fee or commission in connection with this transaction.

B.   ADDITIONAL AGREEMENTS

1.   At the option of the Purchaser, the Seller shall repurchase any Mortgage Loan if the related borrower fails to make any two (2) of the first six (6) monthly payments due to the Seller following the related Purchase Date within thirty (30) days after each such payment was due. Such repurchase will be made at the Repurchase Price in accordance with Section 710 of the Seller Guide.

2.   If the Seller fails to provide the Purchaser with a complete electronic data file with respect to each Mortgage Loan containing all loan level data required by the Purchaser, the Purchaser shall have the right (but not obligation) to complete such electronic data file on the Seller's behalf. In such case, any data file completed by the Purchaser on the Seller's behalf shall for all purposes of the Agreement be deemed to have been provided to the Purchaser by the Seller and the Seller shall be liable to the Purchaser for the truth, accuracy and completeness of all such data, even if the Purchaser was negligent in completing such electronic data file.

3.   Seller acknowledges that Lehman Bank may not have conducted any pre-Purchase Date review of the Mortgage Loan files to determine whether or not they are eligible for purchase by Lehman Bank under the Seller Guide. Lehman Bank expressly reserves the right (but not the obligation) to perform a purchase review of the Mortgage Loans and the Mortgage Loan files after the Purchase Date and to exercise any rights or remedies that may be available to Lehman Bank thereunder.

4.   The "Good File Delivery Credit" referred to in Section 600 of the Seller Guide shall not apply to the transactions contemplated by this Agreement.

# EXHIBIT C

# LEHMAN BROTHERS BANK, FSB

### LOAN PURCHASE AGREEMENT

### (SERVICING RELEASED TRANSACTIONS)

This is a LOAN PURCHASE AGREEMENT (the "Agreement"), dated as of _12|19_, 200☰; [Seller No. _8102_], by and between Lehman Brothers Bank FSB, having an office at 921 North Orange Street, Wilmington, Delaware 19801 ("LBB") and _Ocean House Mortgage Corporation_ having an office at _385 South Main Street Providence RI 02903_ (the "Seller").

## WITNESSETH:

WHEREAS, the Seller desires to sell, from time to time, to LBB, and LBB desires to purchase, from time to time, from the Seller, certain conventional, adjustable and/or fixed-rate residential mortgage loans (the "Mortgage Loans") which shall be delivered on a servicing released basis, on various dates (each a "Purchasing Date") as provided in the Aurora Loan Services Inc. Seller's Guide, as amended from time to time (the "Seller's Guide");

WHEREAS, each Mortgage Loan is secured by a mortgage, deed of trust or other security instrument creating a valid lien on a residential dwelling located in the jurisdiction indicated in the Delivery Commitment Confirmation for the related Mortgage Loan;

WHEREAS, LBB and the Seller have agreed that the Mortgage Loans shall be conveyed in the manner set forth in the Seller's Guide; and

WHEREAS, this Agreement is the "Loan Purchase Agreement" referred to in Section 100 of the Seller's Guide;

NOW, THEREFORE, in consideration of the premises and mutual agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, LBB and the Seller agree as follows:

SECTION 1. Agreement to Purchase   The Seller agrees to sell, and LBB agrees to purchase, from time to time, Mortgage Loans as further described in the related Purchase Advice and the related servicing rights thereto, pursuant to the terms and conditions of the Seller's Guide.

SECTION 2. Incorporation of Seller's Guide; Conflicts; Seller Agreement.   The terms and provisions of the Seller's Guide and all forms therein are hereby incorporated and made a part hereof and are an integral part of this Agreement. In the event of any conflict, inconsistency or discrepancy between any of the provisions of the Seller's Guide and any of the provisions of this Agreement, the provisions of this Agreement shall control and be binding upon LBB and the Seller. The Seller hereby (i) acknowledges that it has received and reviewed the Seller's Guide and (ii) agrees to be bound by the terms and conditions set forth therein.

SECTION 3. Counterparts.   This Agreement may be executed simultaneously in any number of counterparts. Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument.

SECTION 4. Successors and Assigns; Assignment of Loan Purchase Agreement.   This Agreement shall bind and inure to the benefit of and be enforceable by the Seller and LBB and their

Loan Purchase Agreement – LBD
Revised 05/01/02

Page 1 of 3

CONFIDENTIAL

ALS0001797



# LEHMAN BROTHERS BANK, FSB

respective successors and assigns. This Agreement shall not be assigned, pledged or hypothecated by the Seller to a third party without the consent of LBB.

SECTION 5. Defined Terms. Capitalized terms used but not defined herein shall have the respective meanings set forth in Section 8 of the Seller's Guide.

SECTION 6. Costs. All costs and expenses incurred in connection with the transfer and delivery of the Mortgage Loans, shall be paid by the party identified in the Seller's Guide, as applicable, or if no party is identified, by the Seller.

SECTION 7. Notices. All demands, notices and communications hereunder shall be in writing and shall be deemed to have been duly given if mailed, by registered or certified mail, return receipt requested, or, if by other means, when received by the other party at (i) the address in the Seller's Guide if to LBB, and (ii) as follows if to the Seller:

Attn.: _JOHN C PONTE_
_DREAM HOME MORTGAGE CORP_
_385 SIXTH MAIN STREET_
_PROVIDENCE  RI 02903_

or such other address as may hereafter be furnished to the other party by like notice. Any such demand, notice or communication hereunder shall be deemed to have been received on the date delivered to or received at the premises of the addressee (as evidenced, in the case of registered or certified mail, by the date noted on the return receipt).

SECTION 8. Governing Law. This Agreement and the Seller's Guide shall be construed in accordance with the laws of the State of New York and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with the laws of the State of New York, except to the extent preempted by Federal law.

SECTION 9. Waivers. No term or provision of this Agreement may be waived or modified unless such waiver or modification is in writing and signed by the party against whom such waiver or modification is sought to be enforced.

SECTION 10. Reproduction of Documents. This Agreement and all documents relating hereto, including, without limitation, (a) consents, waivers and modifications which may hereafter be executed, (b) documents received by any party at the closing, and (c) financial statements, certificates and other information previously or hereafter furnished, may be reproduced by any photographic, photostatic, microfilm, micro-card, miniature photographic or other similar process. The parties agree that any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding, whether or not the original is in existence and whether or not such reproduction was made by a party in the regular course of business, and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

SECTION 11. Further Agreements. The Seller and LBB each agree to execute and deliver to the other such reasonable and appropriate additional documents, instruments or agreements as may be necessary or appropriate to effectuate the purposes of the Seller's Guide.

SECTION 12. Confidentiality. The Seller hereby agrees that the terms and conditions of any Purchase Advice, this Agreement, the Seller's Guide and all Delivery Commitments shall be kept confidential and their contents shall not be divulged to any party without LBB's consent except to the

Loan Purchase Agreement – LBB
Revised 05/01/02

Page 2 of 3

CONFIDENTIAL

ALS0001798

# LEHMAN BROTHERS BANK, FSB

extent that it is necessary for the Seller to do so in working with legal counsel, auditors, taxing authorities or other governmental agencies.

**SECTION 13.** State of Incorporation. The Seller is duly organized validly existing and in good standing under the laws of the state of __RHODE ISLAND__.

**SECTION 14.** Restrictions on Publicity.     Without the prior written consent of ALS, Seller shall not use the corporate names, logos, brand names, trademarks, trade names or service marks of ALS, Lehman Brothers, Lehman Brothers Bank, F.S.B., or any of their respective affiliates, or otherwise identify ALS, Lehman Brothers, Lehman Brothers Bank, F.S.B., or any of their respective affiliates, in Seller's advertising, marketing or promotional material, publicity releases, communications with the press, customer listings, testimonials, websites, any other material distributed by or on behalf of Seller or in any proposals to prospective borrowers, brokers, clients or appraisers.

IN WITNESS WHEREOF, the Seller and LBB have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the date first above written. ·

LEHMAN BROTHERS BANK, FSB
(Purchaser)

By: _____

Name: _____

Title: _____
NICK W. SKOGG
VICE PRESIDENT

(Seller)

By: _____

Name: __John C. Vare__

Title: __President__

CONFIDENTIAL                                   ALS0001799

# EXHIBIT D

## INDEMNIFICATION AGREEMENT

### Loan Number 0033747031

This Indemnification Agreement ("Agreement"), dated as of August 16, 2007, is made by and between Lehman Brothers Bank, FSB a federal savings bank (together with its successors and assigns "LBB"), and Aurora Loan Services LLC, a Delaware limited liability company, and wholly-owned subsidiary of LBB ("Aurora") having an office for the conduct of business at 10350 Park Meadows Drive, Littleton, CO 80134, and Dream House Mortgage Corporation (the "Seller"), having an office for the conduct of business at 385 South Main Street, Providence, RI 2903. LBB, Aurora, and the Seller are sometimes referred to herein as parties.

### WITNESSETH:

WHEREAS, LBB and the Seller are parties to a certain Loan Purchase Agreement (Servicing Released Transactions), dated as of April 10, 2003 (the "Purchase Agreement"), pursuant to which the Seller may sell to LBB from time to time, and LBB may purchase from the Seller from time to time, certain mortgage loans in accordance with the terms of the Purchase Agreement and Aurora's Seller's Guide, as amended from time to time (the "Seller's Guide");

WHEREAS, the Seller made certain material representations and warranties as set forth in the Seller's Guide which LBB relied upon when entering into the Purchase Agreement;

WHEREAS, pursuant to the Purchase Agreement, LBB purchased from the Seller the following described residential mortgage loan(s) (the "Mortgage(s)" or "Mortgage Loan(s)"):

> Loan Number: 0033747031
> Mortgagor Name: GEORGE MARSHALL
> Property Address: 8300 MOUNT LOGAN COURT, LAS VEGAS, NV
89131

WHEREAS, as part of Aurora's quality control efforts, Aurora reviewed the Mortgage Loan(s) and determined that the above-referenced loan contained an alleged FIRST PAYMENT DEFAULT ("Misrepresentation(s)");

WHEREAS, the existence of the alleged Misrepresentation(s) with respect to the Mortgage Loan(s) gives LBB the right to require the Seller to immediately repurchase the Mortgage Loan(s) in accordance with the terms of the Purchase Agreement and the Seller's Guide; and

WHEREAS, in reliance upon the Seller's execution of this Agreement to indemnify LBB and Aurora for any and all losses suffered on the Mortgage Loan(s),

-1-

**Highly Confidential**                    **ALS0000001**

LBB/Aurora have refrained from demanding immediate repurchase of the Mortgage Loan(s) by the Seller.

**NOW, THEREFORE,** in consideration of LBB's and Aurora's forbearance from exercising its right to have the Seller immediately repurchase the Mortgage Loan(s), and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

Section 1.    <u>Agreement to Repurchase</u>. The Seller agrees to repurchase the Mortgage Loan(s) within sixty (60) days from the date of this agreement.

Section 2.    <u>Survival of Agreement</u>. If LBB and/or Aurora do not demand the terms provided under Section 1 of this Agreement to be met at any time from the date of this Agreement, the indemnification terms provided under Section 4 of this Agreement shall remain in full force and effect and shall survive until either the Mortgage Loan has been paid in full, foreclosed, liquidated or otherwise retired and the related Mortgaged Property or REO Property has been liquidated or 60 days years from the date of this agreement have lapsed.

Section 3.    <u>Control of Defaulted Mortgage Loans</u>. In the event that LBB and/or Aurora does not exercise its rights under Section 1 of this agreement to demand repurchase of the loan, LBB and/or Aurora, or its Servicer, shall have sole and exclusive control over the servicing and administration of the Mortgage Loan(s), including after default and, if applicable, over the marketing, administration and disposition of any foreclosed Mortgaged Property or REO Property relating to the Mortgage Loan(s), and the Seller shall not controvert or dispute any costs incurred, or the amount of any selling price set or obtained by LBB for any such property. Notwithstanding anything to the contrary, in no event shall a "full credit bid" made by LBB and/or Aurora or any other party at a foreclosure sale of the Property securing the loan limit the rights of LBB and/or Aurora or the obligations of the Seller under this Agreement.

Section 4.    <u>Indemnification</u>. In the event that LBB and/or Aurora does not exercise its rights under Section 1 of this agreement to demand repurchase of the loan, the Seller hereby and at all times hereafter agrees to indemnify and hold LBB and/or Aurora and the Servicer harmless from and against all losses, damages, penalties, fines, forfeitures, legal or other fees, judgments, costs, expenses, debts, obligations and claims which LBB and/or Aurora or the Servicer may have or may hereafter suffer, incur, be put to, pay or lay out, or sustain as a result of any cause related to any current or future default by the mortgagor under the Mortgage Loan (collectively, "Losses"), and the Seller shall pay and discharge within thirty (30) days of written demand by LBB and/or Aurora or the Servicer, all Losses made, invoiced or apportioned against the Seller by LBB and/or Aurora or the Servicer, absolutely, and without regard to any mortgage insurance claim or payment whatsoever (the "<u>Seller Loss Obligation</u>"). The existence and amount of any such Losses shall be determined by LBB and/or Aurora and the Servicer in their sole and absolute discretion.

**Highly Confidential**                                                     **ALS0000002**

Section 5.    Remedies Not Exclusive.  LBB and/or Aurora's exercise of any remedy provided by any Mortgage or any related mortgage note shall not be a condition precedent to the Seller's fulfillment of its Seller Loss Obligation.  Further, LBB and/or Aurora's exercise of any right or remedy under this Agreement shall not limit its exercise of any other right or remedy provided to LBB and/or Aurora by the Seller's Guide, the Purchase Agreement, applicable law, by any other agreement to which it and the Seller are parties or otherwise.  This Agreement is in no way to be construed as a waiver of any rights or remedies that LBB and/or Aurora currently has or may have in the future under the Purchase Agreement or otherwise.

Section 6.    No Waiver of Strict Performance.  Nothing in this Agreement shall be construed to waive LBB's and/or Aurora's requirement for the Seller to strictly perform its obligations under the Purchase Agreement and Seller's Guide in the past, present, and future.  Unless expressly provided to the contrary, the failure of any party to insist upon strict performance of any covenant or obligation in this Agreement shall not be a waiver of such party's right to demand strict compliance in the future or to pursue or enforce whatever remedies may be available to such party for any breach or default of or in such covenant or obligation (subject to the applicable statutes of limitation). No consent or waiver, express or implied, to or of any breach or default in the performance of any covenant or obligation in this Agreement shall constitute a consent or waiver to or of any other breach or default in the performance of the same or any other covenant or obligation hereunder.

Section 7.    Statute of Limitations.  In consideration for allowing the Seller to enter into this Agreement rather than repurchase the Mortgage Loan(s), the statute of limitations (and other defenses based upon the passage of time) as to any and all claims, known or unknown, that LBB and/or Aurora may have against the Seller are hereby tolled as they relate to the Mortgage Loan(s).

Section 8.    Representations of the Seller.  The Seller hereby represents and warrants to LBB and Aurora that:

(a)    (1) The execution of this Agreement either has been (i) specifically approved by the Board of Directors of the Seller and such approval is reflected in the minutes of the meetings of such Board of Directors, or (ii) approved by an officer of the Seller who was duly authorized by the Board of Directors to enter into transactions of the type set forth in the Agreement and such authorization is reflected in the minutes of the Board of Directors' meetings; and (2) this Agreement constitutes the "written agreement" of the Seller.  The Seller (or any successor thereto) further warrants that is shall continuously maintain such "written agreement" as an official record of the Seller;

(b)    Performance of its obligations hereunder shall not violate, or require consent under, any applicable law or regulation, or any agreement to which the Seller is a party; and

-3-

**Highly Confidential**

**ALS0000003**

(c)     This Agreement shall be binding and enforceable against the Seller, its successors and assigns in accordance with its terms.

Section 9.     Mortgage Loan File.  The Seller shall promptly deliver an executed copy of this Agreement to LBB and/or Aurora, place an executed copy in its files relating to the Mortgage Loan(s) and refer to the existence of this Agreement in any form, schedule, correspondence or other document forwarded to LBB and/or Aurora, however transmitted, relating to the affected Mortgage Loan(s), including, without limitation, such communications as are related to delinquencies, defaults and foreclosures.

Section 10.     Repurchase.  LBB and/or Aurora reserve the right to demand at any time that the Seller repurchase the Mortgage Loan(s) if an additional material misrepresentation (other than the Misrepresentation) is discovered after the execution of this Agreement and, upon such demand, the Seller agrees to immediately repurchase such Mortgage Loan(s) from LBB and/or Aurora in accordance with the Purchase Agreement and the Seller's Guide.

Section 11.     Miscellaneous.

(a)     This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

(b)     This Agreement may only be amended or modified in writing signed by the party against whom enforcement of such amendment or modification is sought.  Any of the terms or conditions of this Agreement may be waived at any time by the party or parties entitled to the benefit thereof, but only by a writing signed by the party or parties waiving such terms or conditions.

(c)     The invalidity of any portion hereof shall not affect the validity, force or effect of the remaining portions hereof.  If it is ever held that any restriction hereunder is too broad to permit enforcement of such restriction to its fullest extent, such restriction shall be enforced to the maximum extent permitted by law.

(d)     This Agreement shall be governed by and construed in accordance with the laws of the State of New York, regardless of the conflict of laws principles thereof, except as preempted by Federal Law.

(e)     The parties acknowledge and agree that performance under this Agreement shall be made in Littleton, Douglas County, State of Colorado.

(f)     This Agreement may be executed in counterparts, each of which, when so executed and delivered, shall be deemed to be an original and all of which, taken together, shall constitute one and the same agreement.

(g)     Each party warrants and represents that in executing this Agreement, they have relied upon legal advice from the attorney of their choice;

-4-

Highly Confidential                    ALS0000004

that the terms of this Agreement have been read and its consequences (including risks, complications, and costs) have been completely explained to them by that attorney; and that they fully understand the terms of this Agreement.

(h)     Each party acknowledges and warrants that their execution of this release is free and voluntary.

(i)     The parties acknowledge that they have each had the opportunity to review and/or modify this Agreement. The parties agree that the construction and interpretation of this Agreement shall not be strictly construed against any party, and if any ambiguity or question of intent arises with respect to any provision of this Agreement, this Agreement shall be construed as if drafted jointly by all parties.

(j)     Notices shall be given (and deemed effective) as set forth in the Purchase Agreement.

(k)     The parties acknowledge that time is of the essence in the performance of the obligations of this Agreement.

(l)     Each party agrees to execute any and all documents reasonably required to effectuate the terms of this Agreement.

(m)     The descriptive headings of the several paragraphs contained in this Agreement are inserted for convenience only and shall not control or affect the meaning or construction of any of the provisions hereof.

(n)     Capitalized terms used in this Agreement without definition that are defined in the Seller's Guide are used herein as defined in the Seller's Guide.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed as of the date set forth above.

**Lehman Brothers Bank, FSB**
By: _____

Name: Russell V. Brady
Title: Authorized Signatory

**Aurora Loan Services, LLC**

By: _____

Name: Russell V. Brady

Title: Vice President
        Aurora Loan Services

**THE SELLER**
Dream House Mortgage Corporation

By: _____

Name: _____

Title: _____

-5-

# EXHIBIT E

**ASSIGNMENT AGREEMENT**

between

**LEHMAN BROTHERS BANK, FSB,**

as Assignor

and

**LEHMAN BROTHERS HOLDINGS, INC.,**

as Assignee

Dated as of
September 2, 2008

1.

CONFIDENTIAL

ALS_NBGI048729

# ASSIGNMENT AGREEMENT

ASSIGNMENT AGREEMENT (this "Assignment Agreement"), made as of this 2nd day of September, 2008, between Lehman Brothers Bank, FSB, a federal savings bank (the "Assignor" or the "Bank"), and Lehman Brothers Holdings Inc., a Delaware corporation (the "Assignee").

WHEREAS, the Assignor from time to time acquires residential mortgage loans for the purpose of selling, transferring, or conveying those mortgage loans to Assignee;

WHEREAS, the Assignee from time to time acquires residential mortgage loans from Assignor for the purpose of investment in those assets;

WHEREAS, the Assignor is a party to Loan Purchase Agreements (which incorporate the Aurora Loan Services Seller's Guide, which may be amended from time to time (the "Seller's Guide), Guaranty Agreements, Cross-Collateralization Agreements, Related Seller Agreements, and Amendments to those Agreements (referred to herein collectively as the "Agreements" and which may be amended from time to time), pursuant to which Assignor has acquired certain residential mortgage loans from respective Correspondent Sellers of Assignor (referred to herein collectively as "Sellers" and listed on Exhibit A which is incorporated herein by this reference) that Assignor has sold, transferred and conveyed to Assignee (the "Mortgage Loans");

WHEREAS, in furtherance of Assignor's sale of the Mortgage Loans to Assignee and of Assignee's investment purposes in acquiring the Mortgage Loans, Assignor and Assignee have previously agreed to have Assignor assign, transfer and convey to Assignee rights and remedies under the Agreements between Assignor and those Sellers identified on Exhibit A and Assignor and Assignee now wish to document that prior agreement.

NOW, THEREFORE, in consideration of the mutual promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

Section 1. Assignment.

(a) The Assignor hereby assigns, transfers and conveys to the Assignee all of its rights in and to the Agreements, including rights in and to any or all representations, warranties or covenants made by Sellers to Assignor in the Seller's Guide and/or Agreements, along with any or all of the Assignor's remedies available against the Sellers for Sellers' breach of any representation, warranty or covenant under the Seller's Guide and/or Agreements, including, without limitation, the repurchase and indemnification remedies. Pursuant to Section 7 of the Seller's Guide, Assignee is an intended third party beneficiary of those representations, warranties, covenants and remedies set forth in the Seller's Guide or Agreements.

(b) The Assignee hereby accepts such assignment, and shall be entitled to exercise all such rights and remedies of the Assignor under the Seller's Guide or Agreements, as if the Assignee had been a party to each such agreement.

2

CONFIDENTIAL

ALS_NBGI048730

(e) The Assignor shall have the right to amend, modify or terminate the Agreements without the joinder of the Assignee with respect to Mortgage Loans not conveyed to the Assignee hereunder; *provided, however,* that such amendment, modification or termination shall not affect or be binding on the Assignee or the Mortgage Loans.

Section 2. Governing Law.

THIS ASSIGNMENT AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS (OTHER THAN SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW), AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

Section 3. Notices.

Any notices or other communications permitted or required hereunder shall be in writing and shall be deemed conclusively to have been given if personally delivered at or mailed by registered mail, postage prepaid, and return receipt requested or transmitted by telex, telegraph or telecopier and confirmed by a similar mailed writing, to (i) in the case of the Assignor, Lehman Brothers Bank, FSB, 399 Park Avenue, 5th Floor, New York, New York 10022, Attention: Legal Counsel, or such other address as may hereafter be furnished by the Assignor; and (ii) in the case of the Assignee, Lehman Brothers Holdings Inc., 745 Seventh Avenue, 8th Floor, New York, New York 10019, Attention: Manager, Contract Finance, or such other address as may hereafter be furnished by the Assignee.

Section 4. Counterparts.

This Assignment Agreement may be executed in counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same instrument.

Section 5. Binding Nature of Agreement; Assignment.

This Assignment Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

Section 6. Headings Not to Affect Interpretation.

The headings contained in this Assignment Agreement are for convenience of reference only, and they shall not be used in the interpretation hereof.

Section 7. Benefits of Agreement.

Nothing in this Assignment Agreement, express or implied, shall give to any person, other than the parties to this Assignment Agreement and their successors hereunder, any benefit or any legal or equitable right, power, remedy or claim under this Assignment Agreement.

3

CONFIDENTIAL

ALS_NBGI048731

IN WITNESS WHEREOF, the parties hereto have executed this Assignment Agreement as of the day and year first above written.

LEHMAN BROTHERS BANK, FSB

By: _____

Name: Russell V. Brady

Title: Authorized Signatory

LEHMAN BROTHERS HOLDINGS, INC.

By: _____

Name: William Walensky

Title: Authorized Signatory

4

CONFIDENTIAL

ALS_NBGI048732

## EXHIBIT A

1st Chesapeake Home Mortgage, LLC
1-800-East-West Mortgage Company
1st 2nd Mortgage Company of N.J., Inc.
1st Advantage Mortgage, LLC
1st American Mortgage Inc.
1st Chesapeake Home Mortgage, LLC
1st Maryland Mortgage Corporation
1st New England Mortgage Corporation
1st Republic Mortgage Bankers, Inc.
1st State Mortgage LLP
2ci Direct, LLC
A.K.T. American Capital, Inc.
A.W.L.G. Inc.
Aadus Banc Corp.
ACT Lending Corporation
Advance Mortgage Corporation
Advanced Lending Group
Advantage One Mortgage Corp.
Advisors Mortgage Group, LLC
Advisors Mortgage, LLC
Affiliated Funding Corp.
Agency Mortgage Corporation
Alera Financial, LLC
Alethes, LLC
All American Home Mortgage Corp.
All California Mortgage, Inc.
All Finance Mortgage, Inc.
All Home Lending, Inc.
Alliance Financing Mortgage Corp.
Allied Mortgage Group, Inc.
Alpine Lending, LLC
Alpine Mortgage LLC
Alterna Mortgage Company
Alternative Financing Corp.
Amber Financial Group, LLC
AMB Financial Corporation
Amera Mortgage Corporation
Ameribanc One Corporation

5

CONFIDENTIAL

ALS_NBGI048733

AmericanHomeKey, Inc.
American Bank
American Capital Mortgage Bankers, LTD
American Federal Mortgage Corporation
American Fidelity Mortgage Corp
American Financial Resources Incorporate
American General Mortgage Corporation
American Home Bank, N.A.
American Home Equity Corporation
American Homestead Mortgage, LLC
American Mortgage Corporation
American Mortgage Specialists, Inc.
American Nationwide Mortgage, Inc.
American Southwest Mortgage Corp.
American Sterling Bank
America's Mortgage Banc, Inc.
Americor Lending Group, Inc.
Amerifund Financial, Inc.
AmeriMortgage Bankers LLC
Ameritrust Mortgage Bankers Inc.
AmTrust Mortgage Corporation
ANB Financial, N.A.
Apex Lending, Inc.
Approved Funding Corp.
Arlington Capital Mortgage Corporation
Ascella Mortgage, LLC
Ascent Home Loans, Inc.
Assurance Mortgage, LLC
Assured Lending Corporation
Atlantic Bay Mortgage Group LLC
Atlas Mortgage Funding Corp.
Attorneys' Mortgage Services, LLC
Auer Mortgage Co, Inc.
Aurora Mortgage, LLC
Avantor Capital, LLC
Avenya, Inc.
Avex Funding Corporation
Axiom Financial, LLC,
Bank of England
Barrington Capital Corp.

6

CONFIDENTIAL

ALS_NBGI048734

Barrons Mortgage Corporation
BayCal Financial Mortgage Corporation
Bayrock Mortgage Corporation
Baytree Lending Company
Beach First National Bank
Beacon Financial Mortgage Bankers Corp
Bell America Mortgage LLC
Belvidere Networking Enterprises
Bondcorp Realty Services, Inc.
BSM Financial LP
C&G Financial Services Inc.
California Empire Bancorp, Inc.
California Financial Group, Inc.
California Home Investments, Inc.
California Mortgage Advisors, Inc.
Callisto Group Inc.
Cambridge Financial Services, Inc.
Cambridge Funding Group, Inc.
Cameron Financial Group, Inc.
Capital Alliance Advisors, Inc.
Capital Direct Financial, Inc
Capital Financial Services, Inc.
Capital Funding Solutions, Inc.
Capital Mortgage Associates, LLC
Capital Reverse Mortgage Group, Inc
Capitol Mortgage Services, Inc.
Capstone Lending Corp.
Carrollton Bank
Cash Out Mortgage Corp.
CCO Mortgage Corporation
Cedar Mortgage Company
Central Coast One Stop Mortgage Group, Inc.
Central Pacific Mortgage Company
CentralBanc Mortgage Corporation
Century Mortgage Company
Certified Home Loans of Florida, Inc.
CFI Lending Group Inc.
CFS Mortgage Corporation
Chicago Financial Services, Inc.
Christopher E. Hobson, Inc

7

CONFIDENTIAL

ALS_NBGI048735

CIMA Mortgage Bankers L.L.C.
Circle One Mortgage Company
Citimutual Corporation
Citizens National Bank of Paris
City First Mortgage Services, L.L.C.
Citywide Mortgage Corporation
Clarion Mortgage Capital Inc
Classic Home Loans
CLO Funding Corporation
CMG Mortgage Inc.
CML Direct, Inc.
CMS Capital Group, Inc.
Coast Mortgage Corporation
Coastal Capital Corp.
Coastal Mortgage Services Inc.
Cobalt Mortgage, Inc.
Colony Mortgage Lenders, Inc.
Colorado Capital Bank
Colorado Federal Savings Bank
ComUnity Lending, Incorporated
Concord Mortgage Company
Concord Mortgage Corp.
Consumer Mortgage Services, Inc
Continental Mortgage Bankers, Inc.
Continental Mortgage Corp
Coral Mortgage Bankers Corp.
CornerStone Bancor Mortgage Corp.
Cornerstone Mortgage Company
Corstar Financial Inc.
County Trust Mortgage Bankers Corp
Courtyard Financial, Inc.
CSMC, Inc.
CSW Financial, Inc.
CTX Mortgage Company, LLC
Cueva & Associates Inc
Custom Home Loans, Inc.
Cypress Point Funding, Inc.
DCG Home Loans, Inc.
Delta Home Loans, Inc.
DHA Financial, Inc.

8

ALS_NBGI048736

Diablo Funding Group, Inc.
Direct Lending, Inc.
Direct Mortgage Corporation
Discover Mortgage Company
DMI Funding, Inc.
Dollar Mortgage Corporation
Dream House Mortgage Corporation
Dynamic Capital Mortgage, Inc.
E*Trade Bank
E*Trade Mortgage Corporation
E.C.I. Corporation
Eagle Home Mortgage, LLC
East Coast Mortgage Corp.
Eastern Financial Home Loans Corporation
eHomeCredit Corp.
Embassy Mortgage, Inc.
EMC Holdings, LLC
Epix Funding Group, Inc.
EquiPoint Financial Network, Inc.
Equity Mortgage Corporation
Equity National Funding Group, Inc.
Equity One, Inc.
Equity Plus Inc.
Equity Resources, Inc.
Etekcapital, LLC
Evolution Funding Group, LLC
Executive Funding, Inc.
Extol Mortgage Services, Inc.
EZ Funding Corp.
Fairfield Financial Mortgage Group Inc.
Fairmont Funding Ltd.
Farmers and Merchants Bank of Long Beach
FBM, LLC
Financial Capital, Inc.
FineTech Financial Services, Inc.
First Alliance Mortgage Corp of Delaware
First Allied Mortgage
First American Realty Capital Corp.
First Capital Financial Services Corp.
First Capital Group, LP

9

CONFIDENTIAL

ALS_NBGI048737

First Capital Mortgage Corp.
First Colony Mortgage Corporation
First Community Mortgage, Inc.
First Continental Mortgage and Investment Corp.
First Estate Funding Corp.
First Federal Mortgage Inc.
First Federated Funding Corp of South Florida
First Fidelity Financial, Inc.
First Financial Equities, Inc.
First Financial Lender
First Funding Financial Services, Inc.
First Guaranty Financial Corporation
First Guaranty Mortgage Corp. - VA
First Horizon Home Loans a div of FTBNA
First Houston Mortgage, Ltd
First Independent Mortgage Company
First Integrity Mortgage Corporation
First Lincoln Mortgage Corp.
First Madison Mortgage Corporation
First Metropolitan Funding Corporation
First Mortgage Corporation
First NLC Financial Services, LLC
First Ohio Banc & Lending, Inc.
First Rate Capital Corp
First Residential Mortgage Services Corp
First West Mortgage Bankers, Ltd.
Firstline Residential, Inc.
Fisher Financial Group Incorporated
Flagstar Capital Markets Corporation
Flick Mortgage Investors, Inc.
Florida Professional Mortgage Inc
F-M Mortgage Corp.
FNB Mortgage, LLC
Foothill Funding Group, Inc.
Fortune One Mortgage Corporation
Franklin First Financial, Ltd.
Frontier Investment Company
Gateway Bank, FSB
Gateway Business Bank
Gateway Funding Diversified Mortgage Services, LP

10

CONFIDENTIAL

ALS_NBGI048738

Gateway Mortgage Group, LLC
Gecko Mortgage, Incorporated
Genesis Mortgage Corp.
Genpact Mortgage Services, Inc.
Global Lending Group Inc.
Gold Mortgage Banc, Inc.
Golden Empire Mortgage, Inc.
Grand Bank, NA
Great Country Mortgage Bankers Corp.
Great Western Financial Group, Inc.
Greene Financial Services, Inc.
Griffin Mortgage Corporation
Grovebay Financial, Inc.
Guaranteed Home Mortgage Company, Inc.
Guaranteed Rate, Inc.
Guaranty Bank
Guild Mortgage Company
Hamilton Group Funding, Inc.
Hamilton Mortgage Company
Hartford Financial Services, Inc.
Hartland Mortgage Centers, Inc.
Heritage Plaza Mortgage, Inc
HMLNSUSA, Inc.
Hogar Mortgage and Financial Services
Home Capital Funding
Home Loan Center, Inc
Home Loan Network Corporation
Home Loan Specialists, Inc.
Home Mortgage, Inc.
Home Savings Mortgage
Home Savings of America
Homeowners Mortgage of America, Inc.
Homeservices Lending, LLC
Homestead Mortgage Corporation
Hometrust Mortgage Company
Homewide Lending Corporation
Horizon Direct, Inc
I.F.G. Mortgage Services, Inc.
Ideal Mortgage Bankers, Ltd.
INCG Capital Group, Inc.

11

CONFIDENTIAL

ALS_NBGI048739

# EXHIBIT F

**Printed By:** pljfg                    AURORA LOAN SERVICES -- 364

**Loan Number:** 0032204059        **Borrower Name**

```
   LNTH 0032204059             LOAN TRANSFER HISTORY        05/08/09  11:24:30

   TRAN DATE OLD/INV  NEW/INV HT NM S/R/M  ADDITIONAL TRANSFER INFORMATION
   DATE PAID EFF DATE EFF BALANCE   INV LOAN #    OLD S/F    NEW S/F   GF AFT B/B
   ------------------------------------------------------------------------------
   07/26/07  F65/001  R64/001 3  Y  SALE    TO LEHMAN BROTHERS HOLDINGS
   07/26/07  05/01/07   98137.32   0032204059  .00500000   .00000000 +00.000000

   12/12/06  F65/001  F65/001 3  N  MAINT   SERVICE FEE
   12/12/06  11/01/06   98601.41   0032204059  .00250000   .00500000 +00.000000

   08/25/06  M61/499  F65/001 3  Y  SALE    TO SASCO 2006-S3
   08/25/06  09/01/06   98868.04   0032204059  .00250000   .00250000 +00.000000

   08/24/06  B64/106  M61/499 3  Y  SALE    TO SASCO 2006-S3
   08/24/06  07/01/06   98913.00   0032204059  .00000000   .00250000 +00.000000


   ----------------------------------------------------------------------------
```

# EXHIBIT G

**Printed By:** pljfg                        AURORA LOAN SERVICES -- 364

**Loan Number:** 0033038712          **Borrower Name:** ▉▉▉▉▉▉▉▉

```
    LNTH 0033038712                LOAN TRANSFER HISTORY        05/08/09  10:57:38

 TRAN DATE OLD/INV  NEW/INV HT NM S/R/M  ADDITIONAL TRANSFER INFORMATION
 DATE PAID EFF DATE EFF BALANCE   INV LOAN #    OLD S/F     NEW S/F   GF AFT B/B
-----------------------------------------------------------------------------
 10/15/08  R64/001  R64/827 3  N  MAINT  CATEGORY
 __/__/__  10/01/06  239863.55    0033038712   .00000000   .00000000 +00.000000

 10/29/07  F83/001  R64/001 3  Y  SALE    TO LEHMAN BROTHERS HOLDINGS
 10/29/07  10/01/06  239863.55    0033038712   .00500000   .00000000 +00.000000

 01/23/07  M61/515  F83/001 3  N  SALE    TO SASCO 2006-S4
 12/29/06  01/01/07  239722.31    0033038712   .00500000   .00500000 +00.000000

 12/29/06  B64/105  M61/515 3  Y  SALE    TO SASCO 2006-S4
 12/29/06  10/01/06  239863.55    0033038712   .00000000   .00500000 +00.000000

-----------------------------------------------------------------------------
```

CONFIDENTIAL                                                          ALS0002027

# EXHIBIT H

**3270 Explorer**

**Printed By:** pljfg

AURORA LOAN SERVICES -- 364

**Loan Number:** 0033038647      **Borrower Name:** ▬▬▬▬▬

```
LNTH 0033038647            LOAN TRANSFER HISTORY        05/08/09  11:01:21

TRAN DATE OLD/INV  NEW/INV HT NM S/R/M  ADDITIONAL TRANSFER INFORMATION
DATE PAID EFF DATE EFF BALANCE  INV LOAN #   OLD S/F      NEW S/F  GF AFT B/B
-------------------------------------------------------------------------------
06/03/08  R64/001  J46/002 1  Y  SALE    TO REO LLC 2008-2
06/03/08  10/01/06  960000.00   0033038647  .00000000  .00250000 +00.000000

10/29/07  F79/002  R64/001 1  Y  SALE    TO LEHMAN BROTHERS HOLDINGS
10/29/07  10/01/06  960000.00   0033038647  .00250000  .00000000 +00.000000

10/27/06  M61/512  F79/002 1  Y  SALE    TO LXS 2006-17
10/27/06  10/01/06  960000.00   0033038647  .00250000  .00250000 +00.000000

10/26/06  B64/061  M61/512 1  Y  SALE    TO LXS 2006-17
10/26/06  10/01/06  960000.00   0033038647  .00000000  .00250000 +00.000000


-------------------------------------------------------------------------------
```

CONFIDENTIAL

ALS0002028

# EXHIBIT I

**Printed By:** pljfg                     AURORA LOAN SERVICES -- 364

**Loan Number:** 0033746785            **Borrower Name:** ▐▐▐▐▐▐▐

```
   LNTH 0033746785           LOAN TRANSFER HISTORY        05/08/09  17:42:30

  TRAN DATE OLD/INV  NEW/INV HT NM S/R/M  ADDITIONAL TRANSFER INFORMATION
  DATE PAID EFF DATE EFF BALANCE    INV LOAN #   OLD S/F    NEW S/F   GF AFT B/B
 -------------------------------------------------------------------------------
  06/03/08  R64/001  J46/002 1  Y  SALE    TO REO LLC 2008-2
  06/03/08  03/01/07  455200.00    0033746785  .00000000  .00250000 +00.000000

  05/31/07  H06/002  R64/001 1  Y  SALE    TO LEHMAN BROTHERS HOLDINGS
  05/31/07  03/01/07  455200.00    0033746785  .00000000  .00000000 +00.000000

  02/26/07  B64/110  H06/002 1  Y  SALE    TO SARM 2007-2
  02/26/07  03/01/07  455200.00    0033746785  .00250000  .00250000 +00.000000
```

------------------------------------------------------------

# EXHIBIT J

05/11/2009                **3270 Explorer**               Page 1 of 1

**Printed By: pljfg**              AURORA LOAN SERVICES -- 364

**Loan Number: 0040029084**        **Borrower Name:** ▬▬▬▬▬▬▬

```
     LNTH 0040029084            LOAN TRANSFER HISTORY        05/08/09  11:07:09

     TRAN DATE OLD/INV  NEW/INV HT NM S/R/M ADDITIONAL TRANSFER INFORMATION
     DATE PAID EFF DATE EFF BALANCE  INV LOAN #    OLD S/F    NEW S/F   GF AFT B/B
     ----------------------------------------------------------------------------
     05/29/08  B64/832  769/012 3  Y  SALE    TO LEHMAN BROTHERS HOLDING
     05/29/08  05/01/07  49868.81  0040029084   .00000000   .00000000 +00.000000

     01/16/08  B64/832  B64/832 3  N  MAINT  MISCELLANEOUS FIELDS
      __/__/__  05/01/07  49868.81  0040029084   .00000000   .00000000 +00.000000

     07/20/07  B64/089  B64/832 3  N  MAINT  CATEGORY
      __/__/__  05/01/07  49868.81  0040029084   .00000000   .00000000 +00.000000

     04/09/07  M61/540  B64/089 3  Y  SALE    TO LEHMAN BROTHERS BANK LBB
     04/04/07  03/01/07  49900.00  0040029084   .00000000   .00000000 +00.000000

     04/06/07  M61/540  M61/540 3  Y  SALE    TO SASCO 2007-S1
     04/06/07  03/01/07  49900.00  0040029084   .00500000   .00500000 +00.000000

     ----------------------------------------------------------------------------
     ALREADY AT START OF LOAN HISTORY

              PF8 PAGE FORWARD
```

CONFIDENTIAL                                  ALS0002041

05/11/2009                 **3270 Explorer**

**Printed By:** pljfg         AURORA LOAN SERVICES -- 364

**Loan Number:** 0040029084      **Borrower Name:** ███████████████

```
     LNTH 0040029084          LOAN TRANSFER HISTORY      05/08/09  11:08:55

   TRAN DATE OLD/INV  NEW/INV HT NM S/R/M  ADDITIONAL TRANSFER INFORMATION
   DATE PAID EFF DATE EFF BALANCE  INV LOAN #   OLD S/F     NEW S/F    GF AFT B/B
   -------------------------------------------------------------------------------
   03/26/07  B64/089  M61/540 3  Y  SALE    TO SASCO 2007-S1
   03/27/07  03/01/07  49900.00  0040029084  .00000000   .00500000 +00.000000
```

     ------------------------------------------------------------------------

     PF7 PAGE BACKWARD

CONFIDENTIAL                              ALS0002042

# EXHIBIT K

05/11/2009                          **3270 Explorer**                          Page 1 of 1

**Printed By:** pljfg                 AURORA LOAN SERVICES -- 364

**Loan Number:** 0040081523             **Borrower Name:** ██████████████

```
   LNTH 0040081523              LOAN TRANSFER HISTORY          05/08/09  11:17:21

 TRAN DATE OLD/INV  NEW/INV HT NM S/R/M  ADDITIONAL TRANSFER INFORMATION
 DATE PAID EFF DATE EFF BALANCE   INV LOAN #   OLD S/F     NEW S/F   GF AFT B/B
 -----------------------------------------------------------------------------
 06/03/08  R64/001  J46/002 1  Y  SALE    TO REO LLC 2008-2
 06/03/08  04/01/07  354400.00   0040081523   .00000000   .00250000 +00.000000

 09/21/07  H32/002  R64/001 1  Y  SALE    TO LEHMAN BROTHERS HOLDINGS
 09/21/07  04/01/07  354400.00   0040081523   .00250000   .00000000 +00.000000

 07/02/07  M61/550  H32/002 1  N  SALE    TO SARM 2007-4
 04/27/07  05/01/07  354400.00   0040081523   .00250000   .00250000 +00.000000

 04/25/07  B64/110  M61/550 1  Y  SALE    TO SARM 2007-4
 04/24/07  04/01/07  354400.00   0040081523   .00000000   .00250000 +00.000000


 -----------------------------------------------------------------------------
```

CONFIDENTIAL                                              ALS0002059

# EXHIBIT L

05/11/2009                          **3270 Explorer**                        Page 1 of 1

**Printed By:** pljfg                 AURORA LOAN SERVICES -- 364

**Loan Number:** 0040238933            **Borrower Name:** ████████████

```
   LNTH 0040238933              LOAN TRANSFER HISTORY        05/08/09  11:04:58

TRAN DATE OLD/INV  NEW/INV HT NM S/R/M  ADDITIONAL TRANSFER INFORMATION
DATE PAID EFF DATE EFF BALANCE    INV LOAN #    OLD S/F     NEW S/F   GF AFT B/B
--------------------------------------------------------------------------------
06/03/08  B64/110  J46/002 1  Y   SALE   TO REO LLC 2008-2
06/03/08  08/01/07 332500.00      0040238933   .00000000   .00250000 +00.000000
```

--------------------------------------------------------------------------------

CONFIDENTIAL                                                    ALS0002037

# EXHIBIT M

05/11/2009                              **3270 Explorer**                            Page 1 of 1

**Printed By:** pljfg                   AURORA LOAN SERVICES -- 364

**Loan Number:** 0040629180             **Borrower Name:** ████████████

LNTH 0040629180              LOAN TRANSFER HISTORY        05/08/09  11:27:45

TRAN DATE OLD/INV  NEW/INV HT NM S/R/M  ADDITIONAL TRANSFER INFORMATION
DATE PAID EFF DATE EFF BALANCE   INV LOAN #   OLD S/F    NEW S/F   GF AFT B/B
-----------------------------------------------------------------------------
06/03/08  B64/110  J45/002 1  Y   SALE   TO RLT 2008-2
06/03/08  08/01/07  263000.00   0040629180   .00000000   .00250000 +00.000000

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

CONFIDENTIAL                                                      ALS0002083

# EXHIBIT N

05/11/2009                          **3270 Explorer**                          Page 1 of 1

**Printed By:** pljfg                    AURORA LOAN SERVICES -- 364

**Loan Number:** 0040764961          **Borrower Name:** ████████████

```
     LNTH 0040764961          LOAN TRANSFER HISTORY        05/08/09  11:29:56

  TRAN DATE OLD/INV  NEW/INV HT NM S/R/M  ADDITIONAL TRANSFER INFORMATION
  DATE PAID EFF DATE EFF BALANCE   INV LOAN #   OLD S/F     NEW S/F   GF AFT B/B
  ------------------------------------------------------------------------------
  06/03/08  B64/110  J45/002 1  Y   SALE   TO RLT 2008-2
  06/03/08  10/01/07  652500.00   0040764961  .00000000    .00250000 +00.000000
```

--------------------------------------------------------------------

CONFIDENTIAL                                              ALS0002095

# EXHIBIT O

## Purchase Review Worksheet

| ☐ High Cost Test | | |
|---|---|---|
| ☐ High cost findings have been printed from Clayton website - https://hca.clayton.com and placed in file | | |
| ☐ High cost findings that FAIL in any area are sent to QC | | |
| ☐ Income/Asset Documentation | | |
| ☐Doc Type * | | |
| * If file is Aurora Underwritten Doc Type can be pulled from the UW Approval/1008. If file is Delegated refer to the following chart to make Doc type determination: | | |

| Doc Type | Documents that should be in the file to validate doc type | If you find any of these documents in the file then the doc type listed is not correct. Call the correspondent and verify the correct doc type |
|---|---|---|
| **Stated Income/ Stated Assets (SISA)**<br>• Income/Employment:<br>• Employment must be disclosed on the signed 1003.<br>• All income sources must be itemized on the signed 1003.<br>• Verification of income is not required.<br>• Verbal VOE required 5 days prior to closing.<br>• Assets are stated but NOT verified.<br>• Ratios are calculated | Verbal VOE | Bank Statements or income documentation |
| **No Doc**<br>• Income, employment and assets are not disclosed.<br>• Ratios are not calculated.<br>• No Verbal VOE.<br>• No IRS 4506. | N/A | Income or assets are in the file. |
| **Full Doc**<br>• Assets must be verified<br>• IRS 4506 is required when tax returns are used<br>• Verbal VOE required 5 days prior to closing.<br>• Income, employment and assets are verified. | Pay stubs<br>W-2's<br>Tax Returns<br>Verbal VOE<br>Bank Statements<br>IRS 4506 | No income documentation<br>No asset documentation |
| **Limited Doc**<br>• Employment must be disclosed on the signed 1003<br>• All income sources must be itemized on the signed 1003.<br>• Verification of income is not required.<br>• Income must be reasonable for employment disclosed.<br>• Verbal VOE required 5 days prior to closing.<br>• Assets must be verified<br>• Ratios are calculated based on stated income. | Bank Statements<br>Verbal VOE | Income documentation |
| **No Ratio**<br>• Income/Employment:<br>• Income amount should not be disclosed.<br>• All income sources must be identified on the signed 1003.<br>• Employment must be disclosed on the signed 1003 | Verbal VOE<br>Bank Statements | Income documentation or income listed on the 1003 |

| ☐ Financial Assets after closing on delegated files | | |
|---|---|---|
| ☐ Financial Assets after closing* | See formula below to calculate: | |

| Purchase involving the sale of another home: | Purchase not involving the sale of another home: | Refinance: |
|---|---|---|
| 1. Verified assets (total liquid assets on page 2 of the 1003)<br>2. Minus cash from borrower on HUD-1<br>3. Minus cash to borrower on sale of their current home (using that HUD-1 in file) | 1. Verified assets<br>2. Minus cash from borrower on HUD-1 | 1. Verified assets<br>2. Minus cash from borrower on HUD-1 or<br>3. Plus cash given to borrower on the HUD-1 |

| ☐ Total Qualifying Housing Payment | See formula below |
|---|---|
| _____ Principal and Interest (Use interest only if interest Only loan) | |
| +_____ Principal and Interest on the second or subordinate lien | |
| +_____ Property Taxes | |
| +_____ Insurance-hazard and flood | |
| +_____ Homeowners Insurance | |
| +_____ Mortgage Insurance | |
| +_____ Homeowners Association dues | |
| +_____ Ground rent (leasehold properties) | |
| =_____ Total Qualifying Housing Payment | |

51635

- 2927

Name of Reviewer _Tiffany_

Date of Review _2-15-07_

# EXHIBIT P

# LEHMAN BROTHERS BANK FSB

7/21/2006                                                    Purchase Suspense

DREAM HOUSE MORTGAGE CORPORATION
SUE TRAVISONO

        RE   Aurora/LBB Loan #  0033038647
             Borrower   ██████
             Seller Loan #  260505004
             Commitment #  0810201064
             Commitment Expiration Date

## I. Purchase Suspense Documentation

Aurora Loan Services, on behalf of Lehman Brothers Bank, FSB, has completed its
review of the purchase file referenced above and is holding the purchase package in
suspense for the following

  1  PAY HISTORY
     ADDITIONAL REQUIREMENT
     PLEASE PROVIDE A PAY HISTORY SHWOING JULY'S PAYMENT HAS BEEN
     MADE

  2  Underwriting Conditions
     PROVIDE HUD-1 FROM THE SALE OF PRESENT HOME, NETTING AT LEAST
     -PROVIDE HUD-1 FROM THE SELL OF ████ NORTH PLANTATION HARBOUR DRIVE-
     EVIDENCING AMERICAS SERVICING COMPANY ACCOUNT #  1061205230079 WITH
     A BALANCE OF $999,937 IS PAID IN FULL

     PROVIDE UPDATED 1003 SHOWING THE FOLLOWING CORRECTIONS
     -COMPLETED /REO    REO MUST LIST ALL PROPERITES OWNED BY BORROWER
     ALONG WITH ANY RENTAL INCOME- CREDIT REPORT OBTAINED BY AURORA
     INDICATE BORROWER HAS 3 NEW MORTGAGES ACCOUNTS NOT REFLECTING ON
     REO  SPEC LOAN SERV BALANCE $641405 /PAYMENT $6297, CHASE BAL $432000

     CONT-
     BALANCE $472000 /PAYMENT $3677, SPEC LOAN SERV BALANCE $54,030
     PAYMENT $696000 - MUST BRING LOAN WITHIN MAX DTI - DTI WITHOUT
     PROPERTY/RENTAL INCOME 56 87%        ***UTC***

**Please submit all suspense items as a package.  This will assist us in expediting the
review process for suspense items.**

Your immediate attention is needed on all items listed in Section I in order to expedite a
final purchasing decision   The suspense item(s) listed in Section II may not be a complete
schedule of all follow-up conditions   Please return a copy of this notice along with the
conditions to
                Mail stop  1722
                Aurora Loan Services
                327 Inverness Drive South
                Englewood, CO  80112

or fax to       877-706-1886
                Aurora Loan Services
                Attn  Purchasing

If you have any questions or need information as to the status of your conditions, please
feel free to contact
Client Support at 1-866-FUNDS-9% or **email to conduit1722@alservices.com.**

We appreciate your business

Sincerely,


Aurora Loan Services
327 Inverness Drive South
Englewood, CO  80112
JANEENE BELT

**Highly Confidential**                                          ALS0000650

# EXHIBIT Q

February 13, 2007

Allen Parkway Unit ▓▓▓
Houston, TX 77019

Re: Transfer of Mortgage Note

Dear Mortgagor:

Effective **March 4, 2007** your mortgage will be transferred from Dream House Mortgage Corp. to **Aurora Loan Services Inc.** This is common practice between mortgage administrators and will not affect the terms and conditions of your mortgage. You will receive information from **Aurora Loan Services Inc** soon.

*Please be advised your first payment is due on March 01, 2007 in the amount of $ 498.92 and should be directed as follows:*

> **Dream House Mortgage Corp.**
> **PO Box 6907**
> **Providence, RI  02940**

All remaining payments should be directed as follows:

| Payments | Correspondence |
|---|---|
| **Aurora Loan Services Inc.** | **Aurora Loan Services Inc.** |
| **2530 S. Parker Road, Suite 601** | **PO Box 1706** |
| **Aurora, CO 80014** | **Scottsbluff, NE 69369-1706** |

Dream House Mortgage Corp. will provide **Aurora Loan Services Inc.** with a complete set of your loan records. If you have an escrow account, we will notify your homeowner's insurance company of the transfer to ensure the proper billing and timely disbursement of your premiums. Please forward any insurance or tax bills received after **March 4, 2007** to **Aurora Loan Services Inc.** at the above address.

If you have any questions regarding the servicing of your loan, please call the Customer Service Department at **Aurora Loan Services Inc. 800-550-0508,** Monday-Friday 8:00am-8:00pm. It has been a pleasure serving you. Please feel free to contact us again for all of your mortgage needs.

Sincerely,

*Ashley C. Cianci*

Ashley C. Cianci
Dream House Mortgage Representative
Post-Closing Department

# EXHIBIT R

| Home Equity Line of Credit Loan-to-Value or HCLTV (Refer to Combined Loan to Value topic for additional information): | With respect to any first and second lien/Mortgage Loan, the ratio (expressed as a percentage) of the first lien principal amount plus the Home Equity Line of Credit maximum potential balance and any other subordinate financing, divided by the value or acquisition cost, as determined by the Seller's Guide.   See table below for application. |
|---|---|

| Lien Consideration: | Use: |
|---|---|
| Second lien is a HELOC | Maximum line available, regardless of age. |
| First lien allows negative amortization | Maximum possible balance of first lien. |
| Amortizing first and amortizing second lien close concurrently | Original principal amount of each loan. |
| Seasoned amortizing second lien is subordinated to a new amortizing first lien | Original principal amount of the first, unpaid balance of the second. |
| New amortizing second lien is added behind an existing amortizing first lien | Unpaid balance of the first, original principal balance of the second. |

"Second lien" applies to all subordinate financing if more than one subordinate lien exists.

| HOEPA: | The Home Ownership and Equity Protection Act of 1994. |
|---|---|
| HUD: | The Department of Housing and Urban Development. |
| Index: | With respect to each ARM, the financial index required to be utilized as a basis for calculation of the related Mortgage Interest Rate from time to time. |
| Inter Vivos Revocable Trust (aka Living Trust): | Revocable trust created while the donors are still alive, to hold property for the benefit of themselves during their lifetime. |
| Interest Rate: | See Mortgage Interest Rate. |
| Interest Rate Change Date: | With respect to each ARM, the date on which the Mortgage Interest Rate changes pursuant to the terms of the related Mortgage Note. |
| Land Trust: | Revocable, living trust used to title ownership of real estate. Title to the property is held in the name of an institutional trustee. |
| Late Delivery: | The delivery of a Mortgage Loan by Seller to Purchaser after the Delivery Commitment Expiration Date. |
| Late Delivery Penalty: | The monetary amount assessed to Seller for a Late Delivery. |
| Lehman Brothers Bank, FSB ("LBB"): | A federal savings bank ("LBB"), and the Conduit Purchaser.  Parent company of Aurora Loan Services. |
| Life Rate Cap or Life Cap: | The maximum interest rate which may ever be charged over the life of a mortgage on an ARM.  Life Cap may be expressed as a percentage over the initial interest rate or a maximum interest rate. |
| Loan: | A Mortgage Loan or a Cooperative Loan, as the case may be. |
| Loan Documents: | All documents required by Purchaser as outlined in the Seller's Guide.  Documents include but are not limited to Mortgagor's executed application, verification of employment, executed Note, Mortgage, and disclosures. |
| Loan Prospector® (LP): | Automated underwriting system used by FHLMC. |
| Loan Purchase Agreement: | See Purchase Agreement. |
| Loan-to-Value or LTV: | With respect to any Mortgage Loan, the ratio (expressed as a percentage) of the original principal amount of the Mortgage Loan as compared to the value or acquisition cost of the subject Property as determined by the Seller's Guide. |

CONFIDENTIAL

Lehman003807

# EXHIBIT S

January 23, 2007



2043 Longbranch Road
Union, KY 41091

Re: Transfer of Mortgage Note

Dear Mortgagor:

Effective **February 12, 2007** your mortgage will be transferred from Dream House
Mortgage Corp. to **Aurora Loan Services Inc.** This is common practice between
mortgage administrators and will not affect the terms and conditions of your mortgage.
You will receive information from **Aurora Loan Services Inc** soon.

*Please be advised your first payment is due on March 01, 2007 in the amount of $ 458.92 and
should be directed as follows:*

> **Dream House Mortgage Corp.**
> **PO Box 6907**
> **Providence, RI  02940**

All remaining payments should be directed as follows:

Payments                                         Correspondence

**Aurora Loan Services Inc.**          **Aurora Loan Services Inc.**
**2530 S. Parker Road, Suite 601**     **PO Box 1706**
**Aurora, CO 80014**                   **Scottsbluff, NE 69369-1706**

Dream House Mortgage Corp. will provide **Aurora Loan Services Inc.** with a complete
set of your loan records.  If you have an escrow account, we will notify your
homeowner's insurance company of the transfer to ensure the proper billing and timely
disbursement of your premiums.  Please forward any insurance or tax bills received after
**February 12, 2007** to **Aurora Loan Services Inc.** at the above address.

If you have any questions regarding the servicing of your loan, please call the Customer
Service Department at **Aurora Loan Services Inc. 800-550-0508,** Monday-Friday
8:00am-8:00pm.  It has been a pleasure serving you.   Please feel free to contact us again
for all of your mortgage needs.

Sincerely,

*Ashley C. Cianci*

Ashley C. Cianci
Dream House Mortgage Representative

# EXHIBIT T

```
NOTS [redacted]                CONSOLIDATED NOTES LOG              08/19/08 16:49:14
[redacted]          L:  F:  B:  R:        DUE 06/01/08   TYPE 2ND-CONV. R
     ANA Y ARM Y ASM Y BLN Y BNK Y COL Y ELC Y FOR Y HAZ Y LMT Y MIP Y
     PIF Y PMT Y REO Y SER Y TAX Y TSK Y       DATE SELECT: 01/01/01
                                                                    PAGE NO: 10

SER 051407 MJ1 EAMHOUSE                                          227
SER 051407 MJ1 BORROWER CALLED                                   801
               [redacted]
               VERIFICATION PREVIOUSLY COMPLETED
COL 051407 JZM                DISCD LM OPTIONS
COL 051407 JZM                WANT SPEED ACH     PROPERTY PROBLEM
COL 051407 JZM MORT TEL       PROMISE TO PAY     SPEED ACH TAKEN      458.92 0517
COL 051407 JZM SEE NOTES ON LOAN [redacted]
COL 051407 JZM MTR OCC PROP
COL 051407 JZM    VERIFD SS/
COL 051207 J1F                SATURDAY CALL
COL 051207 J1F TEL RES MORN   LEFT MSG W/PERSON
COL 051107 ***  CL700 BREACH LTTR-REG MAILING  LETTER SENT
COL 050407 *** SCORE        050307 AGT EINS DAYS DEL 033 RISK F
COL 050207 ABJ T/RES AFT 5    MTGR. HUNG-UP
COL 050107 M6S T/RES AFT 5    MTGR. HUNG-UP
COL 042007 ***  CL704 1MO DELINQUENT            LETTER SENT
COL 041607 M1M DANIEL T/ SEE NOTS LN [redacted]
COL 041607 M1M                PROMISE TO PAY     SPEED ACH TAKEN      917.84 0426
COL 041607 M1M                RECORD SPEED ACH
COL 041607 M1M MORT TEL       WANT SPEED ACH
COL 041307 ***  CL701 BIP/LM ALTERNATIVE/426H  LETTER SENT
COL 041007 ***  CL700 BREACH LTTR-REG MAILING  LETTER SENT
COL 040507 *** SCORE        040407 AGT EINS DAYS DEL 035 RISK F
SER 040407 KJF DIRECTOR SCRIPT PROCESSED                         DIRSCR
               CS SUPER SCRIPT
SER 040407 KJF SUPER CODE/ACH/SPEED ACH                          ACH
SER 040407 KJF FIRST CALL RESOLUTION - N/A                       CSFCRA
SER 040407 KJF LN DUE FOR MORE THAN 1 PMT/TRNSFRRD TO COLLECTIONS 225F
               SPOKE WITH:[redacted]
               HE WILL CHECK WITH HIS BANK TO VRFY WHAT HIS ACC
               NT # IS THEN WILL SPK W COLL
SER 040407 KJF BORROWER CALLED                                   801
               [redacted]
COL 040307 J2L T POB THEY SD[redacted]IS ON AN EXTENDED LEAVE
                OF ABSENCE AND THEY DOD KNOW WHEN HE WILL BE BACK
               REMOVING POB #
COL 040307 *** UNABLE TO LOCATE ACCOUNT
COL 032907 T2T TEL POB#       NO MESSAGE LEFT
COL 032807 R57 VRU SPEED ACH                                             0329
COL 032807 R57 03/28/2007 7:00:00 PM  468.92
COL 032107 ***  CL704 1MO DELINQUENT            LETTER SENT
COL 031607 D2M T/RES AFT 5    LFT MSG/ANS MACH
COL 031607 D2M REMOVE AREA CODES [redacted]
COL 030707 *** SCORE 003   030707 AGT E16N DAYS DEL 006 RISK F
SER 022007 5BL APPLIED TO COV LINE - TSDOC#[redacted] DOC=DEC
               DEF(S): MORT,MORT
               SOURCE=MCMT COVLINE=351 COVAMT=188000
               POLICY#[redacted] COVTYP=HOMEOWNERS
```